STAR LINE TRUCKING CORPORATION, Plaintiff-
Respondent-Petitioner,

V.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS,
Defendant-Appellant.†

Supreme Court

*No. 80–1645. Argued September 7, 1982.—Decided November 2,
1982.*

(Also reported in 325 N.W.2d 872.)

† Motion for reconsideration denied, without costs, on January
3, 1983. BEILFUSS, C.J., took no part.

For the plaintiff-petitioner there were briefs by *William J. Mantyh* and *Honeck, Mantyh & Arndt,* Milwaukee, and oral argument by *William J. Mantyh.*

For the defendant-appellant there was a brief and oral argument by *Peter W. Zeeh,* Madison.

Amicus Curiae brief was filed by *Jon P. Axelrod, Douglas L. Flygt* and *DeWitt, Sundby, Huggett & Schumacher, S.C.,* Madison, for Wisconsin Motor Carriers Association.

STEINMETZ, J. The issues in the case are:

(1) Does the equipment lease clause mandated by Wisconsin Administrative Code sec. PSC 60.03(2)[1] by

[1] PSC 60.03(2), Wisconsin Administrative Code, provides:

"PSC 60.03 **Lease of motor vehicle.** A lease for the use of a motor vehicle, except interchanged vehicles subject to Wis. Adm.

itself determine the control necessary to defeat the employee exemption under sec. 108.02(3)(a) and (b), Stats.,[2] and therefore create an employer-employee relationship for purposes of unemployment compensation?

(2) Is the commission's decision supported by credible and substantial evidence on the record as a whole?

(3) If the court finds the truck operators were petitioner's employees, was there any error by the Department of Industry, Labor and Human Relations (DILHR) or the Labor and Industry Review Commission (LIRC) in determining the proper amount of unemployment compensation tax to be assessed to the petitioner?

---

Code section PSC 60.04 hereof, must comply with each of the following requirements:

" . . .

"(2) Shall provide for the exclusive possession, control, and use of the motor vehicle involved by the authorized carrier and the complete assumption by such authorized carrier of full responsibility to the public, the shippers, and all regulatory agencies having jurisdiction, during the entire period of the lease, except that a lease for the use of vehicles by authorized interstate or intrastate carriers of household goods as defined by the interstate commerce commission and the public service commission of Wisconsin, respectively, and while being used to transport such household goods exclusively, are required to comply with this subsection only while such vehicle is being operated by them. This exception shall apply as long as a similar exception is in effect by the interstate commerce commission or unless otherwise ordered by the public service commission of Wisconsin."

[2] Sec. 108.02(3)(a) and (b), Stats., provides:

"(3) EMPLOYE. (a) 'Employe' means any individual who is or has been performing services for an employing unit, in an employment, whether or not the individual is paid directly by such employing unit; except as provided in par. (b) or (e).

"(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

"1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his service both under his contract and in fact; and

"2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged."

On February 16, 1976, DILHR conducted an audit of Star Line Trucking Corporation's (Star Line) employment records for the period January 1, 1975, through December 31, 1975, pursuant to its authority under sec. 108.21(1), Stats.[3]

On April 30, 1976, pursuant to sec. 108.21(2), Stats.,[4] DILHR mailed an audit report to Star Line which informed Star Line that unemployment compensation contributions (taxes), along with late filing penalties and interest, were then due for the second, third and fourth quarters of 1975 in the amount of $4,586.12. Thereafter, on May 17, 1976, Star Line filed a timely request for a hearing in accordance with sec. 108.10(1), Stats.[5]

---

[3] Sec. 108.21(1), Stats., provides:

"108.21 **Record and audit of payrolls.** (1) Every employer of one or more persons in Wisconsin shall keep such a true and accurate employment record for each individual employed by him, including full name, address and social security number, as will permit determination of the weekly wages earned by each such individual from him, and shall furnish to the department upon demand a sworn statement of the same. Such record and any other records which may show any wages paid by the employer shall be opened to inspection by any authorized department representative at any reasonable time."

[4] Sec. 108.21(2), Stats., provides:

"(2) The findings of any such authorized representative of the department, based on examination of the records of any such employer and embodied in an audit report mailed to the employer, shall constitute a determination within the meaning of s. 108.10 and said section shall apply accordingly."

[5] Sec. 108.10(1), Stats., provides:

"108.10 **Settlement of issues other than benefit claims.** In connection with any issue arising under this chapter as to any liability, of an employer of one or more persons in Wisconsin, for which no review is provided under s. 108.09 and with respect to which no penalty is provided in s. 108.24, the following procedure shall apply:

"(1) A deputy designated by the department for the purpose shall investigate the existence and extent of any such liability, and may issue an initial determination accordingly; provided, however, that such a deputy may set aside or amend any such determination at any time on the basis of subsequent information

On June 28, 1976, DILHR conducted an audit of Star Line's employment records for the period January 1, 1975, through March 31, 1976. On August 3, 1976, DILHR mailed an initial determination, adopting and incorporating by reference an audit report which assessed Star Line for delinquent unemployment contributions (taxes), late filing penalties, and interest for all of 1975 and the first quarter of 1976, for a total amount of $7,830.89. On August 25, 1976, Star Line filed a request for a hearing which was untimely because it was not filed within the 20 days prescribed by sec. 108.10 (1), Stats. Accordingly, on September 20, 1976, a decision was issued by the appeal tribunal dismissing Star Line's request for a hearing regarding the June 28, 1976, initial determination. Subsequently, Star Line filed a timely petition for review by the Labor and Industry Review Commission under sec. 108.10 (2), Stats.[6]

On July 28, 1977, the Labor and Industry Review Commission affirmed the decision of the appeal tribunal which had dismissed Star Line's untimely request for a hearing regarding the initial determination and audit

---

or to correct a clerical mistake. A copy of each determination shall be mailed to the last known address of the employer affected thereby. The employer may request a hearing as to any matter therein, by filing such request with the deputy within 20 days after such mailing and in accordance with such procedure as the department may by rule prescribe."

[6] Sec. 108.10 (2), Stats., provides:

"(2) Any hearing duly requested shall be held before an appeal tribunal established as provided by s. 108.09 (4), and s. 108.09 (3) and (5) shall be applicable to the proceedings before such tribunal. Within 20 days after the appeal tribunal's decision is mailed to the employer's last-known address, the employer may petition the commission for review thereof pursuant to general department rules. On review, the commission may affirm, reverse, change, or set aside the decision of the appeal tribunal on the basis of evidence previously submitted in such case, or set aside the decision and remand the case to the department for further proceedings."

report dated August 3, 1976. It subsequently came to the attention of the commission that no appeal tribunal hearing had ever been held or scheduled in response to Star Line's timely request for a hearing relative to the matters in the audit report issued on April 30, 1976. Accordingly, pursuant to authority granted in sec. 108.09(6) (d), Stats., the commission ordered on January 9, 1978, that its previous decision of July 28, 1977, be set aside and that testimony be taken before a hearing examiner, acting as a deputy for the commission, with respect to the merits of the case. The commission order of January 9, 1978, was amended on January 25, 1978, to correct a technical error in the language.

A hearing was held on July 10, 1978, before an examiner, acting as a deputy of the Labor and Industry Review Commission. Before any testimony was taken, it was stipulated between DILHR and Star Line, on the record, that the amount of unemployment tax delinquency stated in the initial determination and audit report of August 3, 1976, was correct for the period January 1, 1975, through March 31, 1976, if it was ultimately decided that the contract truck drivers who performed services for Star Line were to be considered employees for purposes of the Unemployment Compensation Act (ch. 108, Stats.).

On December 6, 1978, the Labor and Industry Review Commission issued its decision on the merits of this case, finding that the services of all drivers operating trucks leased to Star Line during the quarters in question, were performed as employees, within the meaning of sec. 108.02(3), Stats. The LIRC confirmed Star Line's liability for unemployment compensation contributions (taxes), penalties and interest as set forth in the audit report of April 30, 1976, and the stipulation of the parties of July 10, 1978.

Star Line commenced an action for judicial review of the commission decision, in Milwaukee County circuit court, on December 30, 1978, pursuant to secs. 108.10 (4),[7] 108.09 (7),[8] and 102.23 (1), Stats.[9] The Honorable Patrick T. Sheedy, in a memorandum decision issued

[7] Sec. 108.10(4), Stats., provides:

"(4) The employer may commence action for the judicial review of a commission decision hereunder, provided said employer, after exhausting the remedies provided hereunder, has commenced such action within 30 days after such decision was mailed to his last known address. The scope of judicial review, and the manner thereof insofar as applicable, shall be the same as that provided in s. 108.09(7)."

[8] Sec. 108.09(7), Stats., provides:

"(7) JUDICIAL REVIEW. (a) Either party may commence judicial action for the review of a decision of the commission under this chapter after exhausting the remedies provided under this section if the party has commenced such judicial action in accordance with s. 102.23 within 30 days after a decision of the commission is mailed to a party's last-known address.

"(b) Any judicial review under this chapter shall be confined to questions of law, and the provisions of ch. 102 with respect to judicial review of orders and awards shall likewise apply to any decision of the commission reviewed under this section. In any such judicial action, the commission may appear by any licensed attorney who is a salaried employe of the commission and has been designated by it for this purpose, or at the commission's request by the department of justice.

"(c) If, as a result of judicial review of a commission decision denying an employe's eligibility for benefits, it is finally determined that benefits are payable, they shall be calculated as of the date of the commission's decision."

[9] Sec. 102.23(1), Stats., provides in part:

"102.23 Judicial review. (1) . . . . Within 30 days from the date of an order or award made by the commission either originally or following the filing of a petition for review with the department under s. 102.18 any party aggrieved thereby may by service as provided in par. (2) commence, in circuit court, an action against the commission for the review of the order or award, in which action the adverse party shall also be made a defendant. . . ."

June 19, 1980, reversed the decision of the Labor and Industry Review Commission and found that the truck drivers in question were not employees within the meaning of sec. 108.02 (3). On July 15, 1980, the circuit court entered a judgment in favor of Star Line and against DILHR, reversing the findings, conclusion, decision and order of the Labor and Industry Review Commission and remanded the matter to said commission with directions that its findings, conclusion, decision and order be set aside.

DILHR appealed the circuit court judgment to the court of appeals. The court of appeals, in an unpublished per curiam opinion, reversed the circuit court and found that the owner-operators were clearly employees within the meaning of sec. 108.02 (3) (a), Stats.

DILHR is an agency of the executive branch of Wisconsin state government. Among other responsibilities, DILHR is charged by the legislature with responsibility for the administration, implementation and enforcement of the Unemployment Compensation Act, ch. 108, Stats.

Star Line is a Wisconsin business corporation formed in 1961 and engages in the bulk trucking of commodities. It owns no hauling equipment but relies exclusively upon subcontracting its hauling operations to contractor-lessors.

During the period of time in question (January 1, 1975, through March 31, 1976), the relationship between Star Line and its drivers, who own their own trucks, was reduced to a written contract. Contracts made between Star Line and its owner-drivers between January 1, 1975, and December 31, 1975, were denominated as "Equipment Lease Agreement" and were for a term of one year. Such contracts included the following provisions:

"(2) Said above described equipment shall, during the term of this lease agreement, be under the exclusive pos-

session and control of Lessee [Star Line] and Lessee shall assume full responsibility to the public, shippers, Public Service Commission of Wisconsin, Motor Vehicle Department of Wisconsin and other regulatory bodies having jurisdiction over its operations."

"(3) All persons driving the described vehicle while under the possession, control or use of Lessee [Star Line] shall be employees of the Lessee and under control of Lessee."

"(6) Lessor [owner-driver] further agrees that he will personally drive the described equipment, or will furnish a substitute drive [sic] for such purpose such substitute drive [sic] to be subject to approval of Lessee [Star Line] as to fitness: it is understood that said drive [sic] shall be a direct employee of Lessee and under the direction and control of Lessee insofar as to the driving of said vehicle is concerned, and Lessee, as the direct employer of said driver shall be responsible for the actions of said driver to any regulatory bodies controlling operation of the described equipment or any third parties affected by reason thereof: further, Lessee shall pay said driver, whether it be Lessor or substitute driver, directly, payment for said driving to be by separate check at prescribed union scale for said driving, and subject to all driver benefits as designated in contracts in effect with Teamsters Local 200; it is understood between Lessor and Lessee that all said wages or benefits paid to said driver, whether it be Lessor or substitute driver, by Lessee in accordance with this agreement shall be deducted from the compensation due Lessor for the use of the described equipment earned under this lease."

"(12) Either party may terminate this Lease agreement by giving thirty (30) days notice in writing to the other."

The written contracts between Star Line and its owner-drivers after January 1, 1976, were denominated as "Equipment Agreement" and were for a term of three months, with automatic, month-to-month renewal thereafter. The agreement in the record was not executed. These contracts, if any, that were in force between January 1, 1976, and March 31, 1976, contained the following provisions, among others:

"ARTICLE 7. —Subject at all times to the other provisions of this Agreement, the equipment aforesaid shall be operated for CARRIER [Star Line] in order to satisfactorily and safely effect the carriage of products, and during the term hereof, shall be furnished and operated, in carrier's business at all times required by the CARRIER, and during said times shall be operated only in connection with transportation performed by the CARRIER under its certificates as a contract or common motor carrier."

"ARTICLE 10. —All identification plates required by aforementioned governmental and regulatory bodies shall be displayed on CONTRACTOR'S equipment during the term of this Agreement and upon termination hereof, said plates shall be removed and delivered to the CARRIER [Star Line]. . . ."

### "EXCLUSIVE POSSESSION & CONTROL

"As required by Wisconsin Administrative Code Section PSC 60.03 and the Interstant [sic] Commerce Commission, the CARRIER [Star Line] and CONTRACTOR [owner-driver] agree that the motor vehicle equipment described in this 'Equipment Agreement' when operated in connection with transportation under the CARRIERS license as a contract or common motor carrier shall be in the exclusive possession, control and use of the CARRIER during the term of this Agreement and the CARRIER hereby assumes full responsibility to the public, the shippers and all regulatory agencies having jurisdiction, for the operation of said motor vehicle equipment during the entire period of the Agreement."

Star Line acknowledged having used the two differently entitled subcontracting agreements referred to, but claims its relationship, understanding and practice with the lessors did not vary in any degree during the entire period.

The 1976 unsigned agreement, besides containing the provision relating to "Exclusive Possession & Control" had the following clauses:

"IV. *RELATIONSHIP*—It is the intention of the parties and acknowledged by the parties that neither the CONTRACTOR nor any of its employees shall be deemed to be agents, servants, or employees of the CARRIER for any purpose whatsoever but the CONTRACTOR is and shall be an independent contractor and is subject to the CARRIER merely as to the results to be accomplished and not as to the means and methods for accomplishing the results."

Under "Terms and Conditions" of the 1976 agreement, the following was stated:

"ARTICLE 1. —The CONTRACTOR shall have exclusive responsibility and control to direct the operation of its equipment and its employees in all respects, including but not limited to such matters as establishing work rules, assignment of equipment to drivers, rejection of any loads, operation, lawful routes, points of service or repair of equipment, rest stops, parking and storage when not in use, etc., except that CONTRACTOR shall fully and efficiently perform the results required by this Agreement."

The court of appeals cited *Stafford Trucking, Inc. v. ILHR Dept.*, 102 Wis. 2d 256, 306 N.W.2d 79 (Ct. App. 1981) and stated that in *Stafford* that court decided that inclusion of Wis. Adm. Code Sec. PSC 60.03 (2), which is required in leases of this nature, established that the lessor "unquestionably has the right and power to direct and control the owner-operators' conduct. It is immaterial whether the right or power to control is in fact exercised as long as the right to exercise such control exists." *Id.* at 263.

We do not interpret the decision in *Stafford* as holding that the inclusion of the PSC clause is conclusive on the issue of employer control. In the *Stafford* case, the lease had additional clauses, besides the PSC clause which denoted control. Stafford reserved " 'the right to control the manner, means and details of, and by which the driver . . .' of the leased equipment performs the

service, as well as the ends to be accomplished." *Id.* at 263. Also under the *Stafford* lease, it was stated that "the drivers further agree that the trucks are 'solely and exclusively under the possession, direction, and control' of Stafford." *Id.* at 263.

Moreover, in *Stafford,* the court of appeals found that Stafford's practices also evidenced control over the owner-operators. *Id.* at 263.

This court recognizes that the exception contained in sec. 108.02(3)(b)1, Stats., requires freedom from control or direction, both under the contract and in fact and that the inclusion of sec. PSC 60.03(2) alone, arguably constitutes contractual control. However, these types of clauses are intended solely to promote the safe operations of trucks and to ensure continuous financial responsibility so that truck-related losses do not go uncompensated. The clause protects both the highway-traveling public and the segment of the public directly using trucking services. *See N.L.R.B. v. Deaton, Inc.,* 502 F.2d 1221, 1224–25 (5th Cir. 1974), *cert. denied* 422 U.S. 1047 (1975). The PSC clause was not designed to deny the application of the statutory exception contained in sec. 108.02(3)(b)1 and 2 and determine the employer-employee relationship.

In reviewing questions of law:

"[T]his court does defer to a certain extent to the legal construction and application of a statute by the agency charged with enforcement of that statute. We are further guided by the rule of review under which, as to questions of law, we will not reverse a determination made by the enforcing agency where such interpretation is one among several reasonable interpretations that can be made, equally consistent with the purpose of the statute." (Footnotes omitted.) *De Leeuw v. ILHR Dept.,* 71 Wis. 2d 446, 449, 238 N.W.2d 706 (1976).

Since the PSC clause is required solely to promote safety and financial responsibility among carriers, we

find that DILHR's interpretation of the clause establishing employer control is not an available one.

It is the motor vehicle that must be under the possession, control and use of the authorized carrier so the carrier is chargeable with the "full responsibility to the public, the shippers,[10] and all regulatory agencies having jurisdiction." There is no mention of responsibility to the operators or suggestion they are to be considered employees of the carrier. The drivers are not within the class receiving the protective benefit of PSC 60.03(2). The result of the exclusive possession, control and use of the motor vehicle is for the carrier to assume complete responsibility to and for the protected classes, *i.e.*, public, shippers and all regulatory agencies having jurisdiction.

Accordingly, we hold that the mere inclusion of sec. PSC 60.03(2) does not alone establish the control and direction criteria necessary to qualify the owner-operators as employees as defined in sec. 108.02(3)(b), Stats.

In looking at the contractual terms and facts and circumstances of this case, we find other clauses in the 1975 contract that do establish the carrier's control over the owner-operators. Those provisions were referred to in the decision of the LIRC as follows:

"All persons driving the described vehicle while under the possession, control or use of Lessee shall be employees of the Lessee and under control of Lessee." (contract clause 3.)

"Lessor further agrees that he will personally drive the described equipment, or will furnish a substitute drive [sic] for such purpose such substitute drive [sic]

[10] The term "shipper" is not defined in the PSC code. It is commonly understood to mean the owner or person for whose account the carriage of goods is undertaken. *Norman G. Jensen, Inc. v. Federal Maritime Commission*, 497 F.2d 1053, 1056 (8th Cir. 1974). Webster's Third New International Dictionary (1967) defines "shipper" as one that sends goods by any form of conveyance.

to be subject to approval of Lessee as to fitness: it is understood that said drive [sic] shall be a direct employee of Lessee and under the direction and control of Lessee insofar as to the driving of said vehicle is concerned [sic], and Lessee, as the direct employer of said driver shall be responsible for the actions of said driver to any regulatory bodies controlling operation of the described equipment or any third parties affected by reason thereof . . . ." (contract clause 6.)

These contractual provisions in the 1975 contract were sufficient to make unavailable to lessee (Star Line) the exception contained in sec. 108.02(3)(b)1, Stats., since they provided Star Line control or direction over the owner-operator under the contract, and it was not necessary therefore to consider the factual relationship between the lessee and lessor.

Therefore, the Labor and Industry Review Commission's determination that the owner-operators were employees of Star Line for purposes of unemployment compensation contributions by Star Line is affirmed for the period covered by the 1975 contract.

The 1976 contracts have different provisions than the 1975 contracts. Clauses 3 and 6 of the 1975 agreement do not appear in the 1976 contracts. The commission determined the owner-operators were not free of control or direction for performance of services, both under contract and in fact. Since we find no contractual control or direction, we must examine whether there was control or direction in fact.

Sec. 102.23(6), Stats.,[11] reads as follows:

"(6) If the commission's order or award depends on any fact found by the commission, the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside the commis-

[11] Sec. 102.23(6), Stats., was created by ch. 195, Laws of 1977.

sion's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported *by credible and substantial evidence.*" (Emphasis added.)

The relevant evidence that was before the commission as to the performance of services in fact evidencing lack of control was:

(1) The drivers were considered "skilled operators" who owned their own truck equipment.

(2) The drivers assumed responsibility for their vehicle maintenance, insurance and trip expenses.

(3) The drivers sometimes refused to haul loads offered by Star Line.

(4) The drivers sometimes engaged helpers to assist them in performing services for Star Line.

(5) Star Line could complain to the drivers and/or terminate the equipment lease agreement. Star Line never exercised this termination right during the period involved.

(6) During the contract period, several contractor-lessors terminated the relationship in response to Star Line's complaints concerning vehicles being unavailable due to their use for other authority holders or traffic and weight violations during performance of the hauling contracts.

(7) The lessors were free to, and did on occasion, reject hauling contracts from Star Line.

(8) The means of performance, namely, which piece of equipment and which driver would be used as well as the starting, completion and elapsed time, the loading, the routes used and number of stops, were within the control and under the supervision of the lessor's drivers.

As opposed to this evidence of lack of control in fact by Star Line over the drivers, DILHR argues the record showed:

(1) Star Line expected the drivers to haul loads for which Star Line had contracted with a customer and would pressure a reluctant driver to accept a load.

Comment: However, pressure applied without a demonstrable result is not exercising control.

(2) Star Line attempted by contract to restrict the drivers from seeking other employment.

Comment: The attempt to convince the drivers to obey the contract cannot be said to be exercising control over them.

(3) Petitioner has the right to terminate the services of a driver at any time, with notice, for any reason, including misconduct.

Comment: However, there is no evidence in the record of any terminations.

(4) Although the drivers owned their trucks, they operated them with Star Line's decal displayed on the door and under ICC authority and PSC permits held by Star Line.

Comment: This was required to identify the hauling authority under which it was being made.[12]

The evidence which DILHR relied on does not demonstrate that Star Line in fact controlled the drivers as spelled out in the statutory exception. The findings of fact of the commission were not supported by "credible and substantial evidence."

Star Line states that one of the issues is whether the contribution base used for payroll in the unemployment

---

[12] Sec. 194.09, Stats., provides:

"194.09 **Marking carrier vehicles.** Each motor vehicle for which a common carrier permit, a contract carrier permit or a private carrier permit is issued, shall be plainly marked in such manner as the department may prescribe, so as to identify such motor vehicle as being operated under such a permit."

compensation audit was properly established at 30% of the rental payment to represent the driver services. However, at the initial hearing before the examiner, the parties stipulated the appropriateness of that figure. DILHR's counsel stated the figures were acceptable and not attackable and Star Line's counsel agreed. The liability figures of the audit were agreed to and the only issue was whether the drivers designated as contractors were independent agents and therefore not employees subject to payroll contributions. The figures were not disputed and therefore no challenging evidence was presented which requires this court to review. Nor does this record require the resubmission of the case to the commission for further determination since there was no reservation of this issue in the record.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

BEILFUSS, C.J., took no part.

SHIRLEY S. ABRAHAMSON, J. *(concurring in part and dissenting in part).* I concur with the majority's holding that because the 1975 contract expressly grants Star Line control or direction over the performance of services of the owner-driver, the owner-driver is not excluded as an employee under sec. 108.02(3)(b)1, Stats. 1979–80. Unlike the majority, I would hold that the 1976 contract which provides that Star Line has "exclusive possession, control and use" of the motor vehicle equipment expressly grants Star Line control or direction over the performance of services of the owner-driver and that the owner-driver is not excluded as an employee under sec. 108.02(3)(b)1, Stats. 1979–80.

Sec. 108.02(3)(a), Stats. 1979–80, provides that any individual who is performing services for an employing unit is an employee except as provided in subsection (b). The majority apparently concludes that the owner-driver

is performing services for an employing unit under sec. 108.02(3)(a) and that the issue in the case is whether the owner-driver falls within sec. 108.02(3)(b).

I agree with the majority, supra at 277, that sec. 108.02(3)(b)1, Stats. 1979–80, requires Star Line to show by satisfactory proof, *Sears, Roebuck Co. v. DILHR,* 90 Wis. 2d 736, 743, 280 N.W.2d 240 (1979), that pursuant to both the terms of the 1976 contract and in fact[1] that

---

[1] Star Line argues on appeal that the parties' actual relationship, not their written contract, is the test of "control or direction" and is therefore determinative of the parties' status under the unemployment compensation act. The majority has not adopted Star Line's position.

Star Line also argues that this court should follow the decisions of the federal courts and other state courts which hold that owner-drivers and not employees. In *Moorman Mfg. Co. v. Industrial Commission,* 241 Wis. 200, 201, 5 N.W.2d 743 (1942), this court rejected the argument that we should look to other jurisdictions' interpretations of unemployment compensation acts to interpret Wisconsin's unemployment compensation act. This court said that Wisconsin's, not other states', legislative policy should determine obligations under the Wisconsin act. The policy of the Wisconsin unemployment compensation act is to aid the unemployed worker who is tied to the labor market and unable to find work and to limit his economic loss and his loss of purchasing power in society. *See, Milwaukee Transformer Co., Inc. v. Industrial Commission,* 22 Wis. 2d 502, 511, 126 N.W. 2d 6, 12 (1964); *Moorman Manufacturing Co. v. Industrial Commission,* 241 Wis. 200, 204–05, 5 N.W.2d 743, 745 (1942); sec. 108.01(1), Stats. 1979–80. Regardless of how other states construe their act, the Wisconsin unemployment compensation act should be construed liberally to protect unemployed persons. *See* Note, *Statutory Construction—Unemployment Compensation Act—Derogation Rule,* 1941 Wis. L. Rev. 269, 271.

Alternatively Star Line argues that this court should apply the common-law rules of agency which distinguish independent contractors from employees (servants) to determine whether an individual is free from control under sec. 108.02(3)(b)1. Although the words "control" and "direction" are not defined in sec. 108.02 (3)(b)1, or in Chapter 108 or in our cases, our court appears to have rejected the argument that Star Line advances here. In

the owner-driver has been and will continue to be free from Star Line's control or direction over the performance of his or her services.[2] While I agree with the majority's statement of the applicable principle of law, I think the principle requires affirmance, rather than reversal, of the decision of the court of appeals.

The majority errs in holding that the terms of the 1976 contract do not provide for "control or direction" by Star Line over the performance of the owner-drivers' services. The 1976 contract grants Star Line "exclusive possession, control and use" of the motor vehicle equipment. The contract reads as follows:

### Exclusive Possession Control

"As required by Wisconsin Administrative Code Section PSC 60.03 and the Interstant [sic] Commerce Commission, the CARRIER [Star Line] and CONTRACTOR [owner-driver] agree that the motor vehicle equipment

---

*Moorman Mfg. Co. v. Industrial Commission,* 241 Wis. 200, 203, 5 N.W.2d 743 (1942), we said that even though the individual was a common-law independent contractor, this characterization "does not necessarily bar him from being an employee under the act. His status under the act must be determined from the act itself in view of the purpose of the act as declared therein. We consider that so construing the act Elliott was an employee."

In *Sears, Roebuck & Co. v. DILHR,* 90 Wis. 2d 736, 750, 280 N.W.2d 240 (1979), the question was raised whether the statutory control test of sec. 108.02(3)(b)1 is or is not a restatement of the common law test applicable to determine who is an independent contractor. The court in *Sears* acknowledged the question but did not answer it. The majority, although it reviews the evidence and decides that control in fact does not exist in this case, fails to define what it means by control.

[2] Although the statute appears to say that the commission determines whether the individual is free from control by looking not only at the time of the cause of action (the year 1976 in this case) but also at the past and future dealings of the parties, neither the majority nor the parties address this question.

described in this 'Equipment Agreement' when operated in connection with transportation under the CARRIERS license as a contract or common motor carrier shall be in the exclusive possession, control and use of the CARRIER during the term of this Agreement and the CARRIER hereby assumes full responsibility to the public, the shippers and all regulatory agencies having jurisdiction, for the operation of said motor vehicle equipment during the entire period of the Agreement."

The majority concludes that this provision of the contract, which is mandated by PSC[3] and ICC[4] regulations,

[3] Sec. PSC 60.03, Wis. Adm. Code, reads in part:

"PSC 60.03 **Lease of motor vehicle.** A lease for the use of a motor vehicle, except interchanged vehicles subject to Wis. Adm. Code section PSC 60.04 hereof, must comply with each of the following requirements:

"(1) Shall be in writing and signed by the parties thereto, or their regular employees or agents duly authorized to act for them in the execution of contracts, leases, or other arrangements. Shall show the year, make and identification, motor or serial number of the motor vehicle as shown on the registration card issued for such vehicle.

"(2) Shall provide for the exclusive possession, control, and use of the motor vehicle involved by the authorized carrier and the complete assumption by such authorized carrier of full responsibility to the public, the shippers, and all regulatory agencies having jurisdiction."

Sec. PSC 60.06, Wis. Adm. Code, reads as follows:

"PSC 60.06 **Agreement meeting ICC rules.** Any lease or interchange agreement meeting the requirements of interstate commerce commission rules in cases involving interstate commerce, will be deemed sufficient to meet the requirements of Wis. Adm. Code subsections PSC 60.03(1), (2), and (3), and PSC 60.04(1) and (2) of these rules, notwithstanding any provision herein to the contrary."

[4] 49 CFR sec. 1057.4(a)(4) (1977) provides:

"(a) *Contract requirements.* The contract, lease, or other arrangement for the use of such equipment:

". . .

"(4) **Exclusive possession and responsibilities.** Shall provide for the exclusive possession, control, and use of the equipment and

does not give Star Line power to control or direct the performance of the services of the owner-driver. The majority reasons that the contractual provision does not mean what it says, that is, that the PSC and the ICC regulations do not intend Star Line to have exclusive control over the motor vehicle. The majority then shifts its position and seems to say that although the contract gives Star Line control, control over the motor vehicle does not mean control over the owner-driver.

The majority appears to nullify the contract's grant to Star Line of exclusive possession, control and use of the motor vehicle by interpreting the intent behind the mandated provision as an intent to impose financial responsibility, that is, to impose liability, on Star Line for truck-related losses. The unstated assumption in the majority's interpretation is that because the administrative agency's reason for requiring the clause is to impose financial responsibility, the clause does not require or permit Star Line to have actual control over the operation of the motor vehicle. The majority explains the contract as follows:

"[These] types of clauses are intended solely to promote the safe operations of trucks and to ensure continuous financial responsibility so that truck-related losses do not go uncompensated. The clause protects both the highway-traveling public and the segment of the public directly using trucking services. See N.L.R.B. v. Deaton, Inc., 502 F.2d 1221, 1224–25 (5th Cir. 1974), cert. den.,

---

for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement. . . ."

49 CFR sec. 1057.12(d) (1981) provides:

"Exclusive possession and responsibilities

"(1) The lease shall provide that the authorized carrier shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."

422 U.S. 1047 (1975). . . . Since the PSC clause is required solely to promote safety and financial responsibility among carriers, we find that DILHR's interpretation of the clause establishing employer control is not an available one. . . . The result of the exclusive possession, control and use of the motor vehicle is for the carrier to assume complete responsibility to and for the protected classes, i.e., public, shippers and all regulatory agencies having jurisdiction." *Supra* at 277, 278.

Neither the PSC rule, nor the ICC rule, nor the *Deaton* case (upon which the majority relies) supports the majority's interpretation of the mandated contractual provision, and neither the majority, nor the parties, nor I have found any authority for the majority's view.

The PSC and ICC regulations clearly show that the regulations concern more than allocation of financial responsibility. The regulations also mandate control. The regulations require contracts like the one in issue in the instant case to cover two points: first, the contract must provide that Star Line has exclusive possession, use and control of the motor vehicles, and second, the contract must provide that Star Line is financially responsible to the highway users and the shippers. In *Deaton* the court recognized that the regulations have at least two interrelated objectives: to promote safe operations of the trucks and to ensure that truck-related losses will not go uncompensated. The first objective, safety, is fostered by both clauses that the regulations require to be in the contract. Star Line is required to have control over the motor vehicles to enable it to ensure safe operations. In addition, Star Line is given the incentive to exercise control over the motor vehicles to ensure safe operations by being financially responsible, under the regulations, for truck-related losses incurred by the highway users and the shippers. The second objective, financial responsibility, is fostered by the regulations making Star Line financially responsible for truck-related losses. The *Dea-*

*ton* court concluded, contrary to what the majority implies, that the ICC regulations have the effect of requiring carriers (such as Star Line) to possess and exercise considerable control over all trucks operated under the certificate. 502 F.2d at 1227.[5]

In its final analysis, the majority appears to concede that the contract does give Star Line control, but intimates that Star Line's control under the mandated contractual provision is over the motor vehicle, not over the owner-driver. *Supra* at 278. The *Deaton* court, taking a common sense approach, makes short shrift of this kind of reasoning, saying, "Control over trucks involves control over drivers." *Id.* at 1227.

Sec. 108.02(3)(b)1 clearly states that if the owner-driver is to be excluded from the classification of employee, the owner-drivers must, under the contract, be free from Star Line's control over the performance of

---

[5] The *Deaton* court's full discussion on this point is as follows:

"In interstate truck line cases an additional wrinkle on the control test has evolved. The Interstate Commerce Commission and the Department of Transportation closely regulate truck lines. The leading purposes of the regulations are to promote safe operation of trucks and to ensure continuous financial responsibility so that truck-related losses will not go uncompensated. The regulations, designed to protect both the highway-travelling public and the segment of the public directly using trucking services, have the effect of requiring the holder of a certificate of public convenience and necessity to possess and exercise considerable control over all trucks operated under the certificate without regard to whether the holder owns the trucks. Control over trucks involves control over drivers. We agree with the Board that it is unnecessary to decide whether ICC-mandated controls alone would be sufficient to establish the employee status of nonowner drivers of leased trucks. In the present case the Board took into account the substantial nexus of control required by federal regulations and also found that the facts established the existence of 'additional controls' voluntarily reserved by Deaton. Thus the Board found that the total controls were sufficient to make out employee status." *NLRB v. Deaton, Inc., supra*, 502 F.2d at 1226–27.

their services. Absent proof by Star Line that the word "control" in sec. 108.02(3)(b)1 is not to be interpreted the same as the word "control" in the PSC-ICC regulations,[6] and absent any proof by Star Line that the mandated contractual provision provides for control of the owner-driver by the federal and state governments[7] rather than by Star Line, the commission, looking at the 1976 contract, could only conclude that under sec. 108.-02(3)(b)1 the contract authorizes Star Line to exercise control over the performance of the services of the owner-driver. Had the legislature intended to preclude the commission from considering mandated contractual provisions as evidence of control under the contract, it would have so stated. Since Star Line has not shown that owner-drivers are, under the contract, free from Star Line's control over the performance of their services, the commission's conclusion that the owner-driver is an "employee" within the meaning of sec. 108.02(3)(a) should be affirmed.

The following memorandum was filed on January 3, 1983.

PER CURIAM *(on motion for reconsideration)*. On its motion for reconsideration, DILHR requests that the case be remanded to the LIRC to make further factual findings. Specifically, DILHR notes that sec. 108.-02(3)(b), Stats., requires that two conditions be met for the exemption to apply. The commission had found that the owner-operators were not free from Star Line's

---

[6] See note 1 *supra* for a discussion of the definition of the word "control."

[7] Star Line does not argue, as others have, that the mandated contractual provision may be just another way of stating that the owner-driver must obey the laws, not Star Line's orders, and that whatever control is exercised is not Star Line's but that of the government. *Cf. Local 777 v. NLRB,* 603 F.2d 862, 875 (D.C. Cir. 1978).

direction or control under sec. 108.02(3)(b)1. Since that finding was made, the commission made no findings on the independently established business test under sec. 108.02(3)(b)2. This court reversed the commission's finding that the owner-operators' services were not free from Star Line's direction or control. DILHR contends that a remand to the commission is necessary to determine whether the owner-operators' services were performed in an independently established business. For an individual to be customarily engaged in an independently established business, it must be such a business as the person has a proprietary interest in, an interest which he alone controls and is able to give away. *Sears, Roebuck & Co. v. ILHR Department*, 90 Wis. 2d 736, 751, 280 N.W.2d 240 (1979). Based on a review of the entire record, since the owner-operators owned their equipment, hired other drivers to perform hauling contracts for Star Line, and were free to select hauling contracts, we find that the independently established business test has been satisfied. Accordingly, we find that both conditions in sec. 108.02(3)(b) have been met and that the owner-operators are not employees under the act.

The motion for reconsideration is denied without costs.

BEILFUSS, C.J., took no part.

SHIRLEY S. ABRAHAMSON, J. *(dissenting on motion for reconsideration).* I dissent from the majority's holding on reconsideration that the owner-operators are engaged in an independently established business, sec. 108.02(3)(b)2, Stats. 1979–80. This court has said that the test set forth in sec. 108.02(3)(b)2 presents a factual question for DILHR and that on review the court will look for credible and substantial evidence in the record to support the Department's findings as to whether the employees in question are engaged in an independently established business. *Sears, Roebuck & Co. v.*

*ILHR Department*, 90 Wis. 2d 736, 744, 280 N.W.2d 240 (1979) ; *Transport Oil, Inc. v. Cummings*, 54 Wis. 2d 256, 267, 195 N.W.2d 649 (1972).

In this case DILHR has made no such findings. Star Line does not appear to have presented evidence specifically related to this issue nor to have addressed this issue at the proceedings before DILHR, the circuit court, the court of appeals, or this court. Nor did Star Line address the issue at oral argument before this court. DILHR first raised the issue in its motion for reconsideration, in response to the majority's holding.

I dissent because I conclude that this court is acting as a fact-finder and as such has exceeded its appellate jurisdiction. I would remand the matter to DILHR.