Steven GOLDBERG and Chester Eisenhauer, d/b/a
Kenosha Counseling & Psychiatric Clinic, Plaintiffs-
Appellants,†

v.

DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS
and Labor & Industry Review Commission,
Defendants-Respondents.

Court of Appeals

*No. 91-2203. Submitted on briefs February 7, 1992.—Decided
April 1, 1992.*

(Also reported in 484 N.W.2d 568.)

† Petition to review denied

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Jeffery R. Brodek* and *T. Dale Barnes* of *DeMark, Kolbe & Brodek, S.C.* of Racine.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Peter W. Zeeh,* of the Department of Industry, Labor and Human Relations and Labor and Industry Review Commission.

Before Nettesheim, P.J., Brown and Anderson, JJ.

ANDERSON, J.   Steven Goldberg and Chester Eisenhauer (partners) appeal a trial court judgment

affirming an order of the Labor and Industry Review Commission (LIRC). LIRC found that three therapists associated with the partners' outpatient psychiatric clinic were employees within the meaning of sec. 108.02(12), Stats. The partners were ordered to make past-due unemployment compensation contributions for the three therapists. Because LIRC's decision is supported by credible and substantial evidence, we affirm the trial court.

Goldberg and Eisenhauer were each one-half owners of a state-certified outpatient psychiatric clinic. The dispute centers on the status of three therapists who each provided counseling services to patients in 1986 and 1987. Although the partners considered the three therapists private contractors, the Department of Industry, Labor and Human Relations (DILHR) determined that the three were employees. No unemployment compensation claims were filed. DILHR subsequently assessed the clinic unemployment compensation tax. The decision was affirmed by LIRC and the trial court.

The standard used to determine whether an individual is an employee for purposes of the unemployment compensation act is found in sec. 108.02(12), Stats. A two-step analysis is used to determine whether an individual is an employee. *Transport Oil, Inc. v. Cummings,* 54 Wis. 2d 256, 262, 195 N.W.2d 649, 652 (1972). The first step is to decide whether an individual "has been performing services for an employing unit, in an employment." Section 108.02(12)(a). An "employment" is any "service . . . performed . . . for pay." Section 108.02(15)(a). If the first step is satisfied, the burden shifts to the employer to establish that it is exempt from coverage by demonstrating two conditions: (1) that the employee has been and will be free from the employer's

"control or direction" both under contract and in fact, *and* (2) that the services are "performed in an independently established trade, business, or profession in which the individual is customarily engaged." Section 108.02(12)(b).

Whether these conditions exist are treated as factual questions. *Sears, Roebuck & Co. v. DILHR,* 90 Wis. 2d 736, 744, 280 N.W.2d 240, 243 (1979). These factual findings may not be overturned unless they are unsupported by the credible and substantial evidence. *Graebel Moving & Storage v. LIRC,* 131 Wis. 2d 353, 356, 389 N.W.2d 37, 39 (Ct. App. 1986). Our scope of review is the same as the trial court's and we reach our decision without deference to that court's decision. *Id.* Our role is to review the record for credible and substantial evidence that supports LIRC's findings rather than to weigh opposing evidence. *Id.* In reviewing the evidence, we note that the question of whether an individual is an employee under the unemployment compensation act is not determined by the parties' labels or agreements, but must be ascertained according to the statutory definition of employee. *Id.* at 355, 389 N.W.2d at 38.

The partners do not dispute that the therapists were employees under sec. 108.02(12)(a), Stats. They challenge LIRC's findings that they could have controlled and directed the therapists' work.[1] Substantial evidence

---

[1]The partners also challenge LIRC's finding that the associates were not customarily engaged in an independently established business or trade. The employer must establish both conditions of sec. 108.02(12)(b), Stats. *Tri-State Home Improvement Co. v. LIRC,* 111 Wis. 2d 103, 109, 330 N.W.2d 186, 189 (1983). Because we conclude that there is credible and substantial evidence to support LIRC's decision that the partners did not satisfy

is evidence that is relevant, credible, probative, and of a quantum upon which a reasonable factfinder could base a conclusion. *Princess House, Inc. v. DILHR,* 111 Wis. 2d 46, 54, 330 N.W.2d 169, 173 (1983). Facts of mere conjecture or a mere scintilla of evidence are not enough to support LIRC's finding. *Id.*

The record reveals the following facts. The clinic was certified by the Wisconsin Department of Health and Social Services under Wis. Adm. Code secs. **HSS 61.91** to **61.98.** Certification was important because it allowed the clinic to bill and collect from third parties, such as insurance companies and governmental agencies. Eighty-five to ninety percent of the payments came from third parties. A clinic may lose its certification if it does not comply with the certification rules.

The certification rules are numerous. Therapy may be given by a psychiatrist or a licensed clinical psychologist. Therapy may also be given by a social worker with a master's degree. If the therapy is given by a social worker, his or her work must be reviewed and supervised by a psychiatrist or a licensed clinical psychologist at certain minimum time intervals.

The clinic must make certain documentation available to the department and is subject to unannounced inspections. The clinic is required to document how the services will be provided for each patient. A review of patient progress must be made at regular intervals by the therapist and the supervisor. The documentation includes, among other things, diagnoses, treatment plans, evaluations, assessments, progress notes, placements, discharge summaries and emergency care. A master appointment book must be notated to indicate

condition one, we need not address condition two. *See National Guardian Life Ins. Co. v. Industrial Comm'n,* 26 Wis. 2d 198, 209, 131 N.W.2d 896, 902 (1965).

that the therapists received the minimum amount of supervision for so many hours of counseling provided.

Therapists Michael and Linda Scheible were employed in jobs outside of the clinic. Therapist Joann Rattan sold her share of the partnership in 1986, but continued to work at the clinic. Part of the sale price included compensation for her "good will" on behalf of the clinic. Linda Scheible and Rattan have master's degrees in social work, and Michael Scheible has a master's degree in psychology. The partners also have master's degrees in social work. All of the outpatient psychotherapy had to be performed through a certified clinic in order to be paid for by third parties. Thus, all of the clinic's counseling, conducted by both the partners and the therapists, was subject to periodic clinical oversight and supervision by a psychiatrist or a licensed clinical psychologist. The partners selected and paid for the supervision by a qualified individual. Neither partner participated in the treatment of the therapists' patients. The partners did not tell the therapists how to keep the documentation; the partners only reminded them to keep the documentation.

The therapists did not have an investment in the clinic and did not share in its profits or losses. They did not receive referrals from other members of the clinic and they were responsible for generating their own clientele. They could counsel patients unconnected to the clinic. For example, Rattan worked as a counselor with a county agency. The Scheibles did not elect to counsel patients other than through the clinic. Other counselors could use the clinic without the partners' permission, but another counselor could not replace one of the therapists without the partners' permission.

Michael Scheible worked through the clinic about two to three hours a week and Linda Scheible worked

about six hours a week. Rattan averaged four hours a week, but did not work during the summer. Michael Scheible's teaching position at a local college required him to continue practicing counseling. The therapists were not necessary for the clinic to be certified.

There was no written contract, office rules, required meetings, or required reports. The clinic did not provide business cards. The therapists set their own fees and schedules, but a master appointment book was maintained pursuant to the rules. The clinic's secretary billed the appropriate party. Forty percent of the payment was retained by the clinic. If the bill remained unpaid or was not paid in full, the secretary would try to obtain full payment. If that was unsuccessful, the therapist would direct what action the secretary should take.

The clinic provided unassigned office space, furniture, some office supplies, and one secretary for everyone in the office. Resource books were available to the therapists. The clinic provided three display advertisements in the phone book, but only one listed all the therapists. Malpractice insurance and continuing education costs were paid by the therapists. They could refer patients to counselors outside of the clinic. Either the clinic or the therapists could end the relationship at any time for any or no reason.

There is credible and substantial evidence to show that the therapists were under the control or direction of the partners for purposes of sec. 108.02(12), Stats. It was crucial for the clinic's financial success to remain certified because eighty-five to ninety percent of the clinic's income came from third parties. Because the relationship with a therapist could be terminated for any reason, the relationship could be terminated if a therapist did not do his or her part in complying with the rules.

■ The clinic is the entity which must comply with the rules. The partners had a personal stake in the financial success of the clinic and protected that stake by requiring that the therapists undertake certain administrative tasks and participate in supervision so that the clinic remained certified. If the therapists did not comply with the rules, the clinic could become uncertified and the partners' income feasibly could decrease by eighty-five to ninety percent; however, the therapists' ability to practice counseling would remain unchanged.[2] Therefore, the fact that the partners had a personal stake in the clinic remaining certified supplies credible and substantial evidence that they could have controlled and directed the therapists.

■ The evidence also shows that the therapists were subject to the supervision and oversight of their work by a licensed clinical psychologist or psychiatrist. The supervisor was hired on a consultant basis by the partners and acted on their behalf. The unavoidable implication of the supervision is that the supervisor could request that the therapists' treatment change if it was not appropriate. No purpose would be served if the supervisor merely evaluated the therapy but was unable to request any alterations. This evidence also supports LIRC's conclusion that the partners failed to show that the therapists were free from their control or direction.

---

[2]If the clinic were to become uncertified, the therapists' income also would decrease. However, the therapists could remedy this by joining an already certified clinic or establishing a certified clinic. There are two situations, not relevant here, where the therapists could be barred from working in a certified clinic for five years. *See* Wis. Adm. Code sec. **HSS 61.98**(5).

The partners cite *Star Line Trucking Corp. v. DILHR,* 109 Wis. 2d 266, 325 N.W.2d 872 (1982), and argue that the administrative rules are the sole evidence relied upon by LIRC and, therefore, LIRC's finding of control or direction is unreasonable.[3] We conclude that LIRC's reliance on the rules in this case is different from the reliance on the rules in *Star Line.*

Star Line engaged exclusively in bulk trucking of commodities. It owned no hauling equipment but relied exclusively upon subcontracting its hauling operations to contractor-lessors. *Id.* at 273, 325 N.W.2d at 875. The lease contract between Star Line and the drivers contained mandatory language promulgated by the Public Service Commission. The mandatory contract language provided for the "exclusive possession, control, and use," *id.* at 268 n.1, 325 N.W.2d at 873, of the truck by Star Line.

One of the issues in *Star Line* was whether the mandatory language, standing alone, determined whether a driver was free from the control or direction of the employer. *Id.* at 267–68, 325 N.W.2d at 873. The court stated that the employer must show that there is freedom from control or direction, both under the contract and in fact. The court held that the mere inclusion of the mandatory language alone, the purpose of which is unrelated to the employee's status, did not establish the control or direction criteria necessary to qualify a driver as an employee within the meaning of sec. 108.02(12), Stats. *Star Line,* 109 Wis. 2d at 278, 325 N.W.2d at 878. The court held that if other evidence, besides the

---

[3]In the partners' reply brief, they assert that sec. 108.02(12), Stats., is ambiguous. However, the language of the statute has been held to be plain and unambiguous. *See Stafford Trucking, Inc. v. DILHR,* 102 Wis. 2d 256, 265, 306 N.W.2d 79, 85 (Ct. App. 1981).

mandatory contract language, establishes control or direction by contract or in fact, the employer fails to meet the burden of sec. 108.02(12). *See Star Line,* 109 Wis. 2d at 278, 325 N.W.2d at 878.

The court reasoned that because the mandatory language was meant to protect the highway-traveling public and the segment of the public directly using trucking services, the language was not designed to determine the employer-employee relationship. *Id.* at 277, 325 N.W.2d at 877. The court further reasoned that whatever control the mandatory language envisioned was control over the truck and not the driver of the truck. The language did not mandate that the drivers be considered employees of Star Line. *Id.* at 278, 325 N.W.2d at 877-78.

The rules in *Star Line* and this case are similar because they do not mandate that the employees are under the control or direction of the employer. In both cases, the underlying policy reason for the rules is unrelated to the status of the employees.[4] The difference in the cases is the role the rules played in LIRC's factual findings. In *Star Line,* the rules were treated without more, as being exclusively determinative of control or direction by contract. In this case, LIRC used the rules to provide that occasion where control or direction could be exercised in fact.

A fair and reasonable inference from the evidence that the therapists could be terminated for any or no reason is that the partners could have exercised control

---

[4]Wisconsin Adm. Code sec. **HSS 61.93**(2) reads in part:

> The outpatient psychotherapy clinic standards have been developed to ensure that services of adequate quality are provided to Wisconsin citizens in need of treatment for nervous or mental disorders or alcohol and drug abuse problems. . . . The standards are designed to assist clinics in the organization and delivery of outpatient services.

or direction over the therapists by terminating them if they did not comply with the rules or cooperate with the supervision. A fair and reasonable inference from the evidence is that the supervisor could have requested that the therapy be altered. The rules became important only because the rules provided the occasion for the partners to exercise control or direction in fact.

■

We recognize that in many instances the rules for certification can be met only by the therapists. The fact remains, however, that the therapists could be terminated if they did not comply with the rules. The rules do not mandate that the therapists *themselves* satisfy the rules, only that the clinic satisfy the rules. The penalty the therapists could receive for not complying with the rules would be termination. The penalty the clinic could receive would be decertification and the partners' income would drop dramatically. Therefore, the partners had a strong interest in requiring that the therapists complied with the rules that kept the clinic certified.

■

It is immaterial whether the right or power to control is in fact exercised as long as the right to exercise such control exists. *Stafford Trucking, Inc. v. DILHR,* 102 Wis. 2d 256, 263, 306 N.W.2d 79, 83 (Ct. App. 1981). Here, the partners had the power to control or direct the therapists in fulfilling the clinic's responsibilities even though they may not have exercised their right.

Therefore, we conclude that LIRC's decision is supported by credible and substantial evidence.

*By the Court.*—Judgment affirmed.