TRI-STATE HOME IMPROVEMENT COMPANY, INC., a Wisconsin corporation, Plaintiff-Respondent-Petitioner,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant-Appellant.

Supreme Court

No. 81–1731. Argued November 30, 1982.—Decided March 1, 1983.

(Also reported in 330 N.W.2d 186.)

For the plaintiff-petitioner there were briefs by *Robert A. Levine* and *Levine & Epstein,* Milwaukee, and oral argument by *Robert A. Levine.*

For the defendant-appellant there was a brief and oral argument by *Peter W. Zeeh,* Madison.

HEFFERNAN, J.   This is a review of an unpublished decision of the court of appeals[1] which reversed an order of the circuit court for Milwaukee county, Patrick T. Sheedy, Circuit Judge, determining that Tri-State Improvement Company's siding salesmen were not employees for unemployment compensation purposes. The circuit court order reversed a determination of the Labor and Industry Review Commission that Tri-State salesmen were employees under the Unemployment Compensation Act. Because we hold that the Labor and Industry Review Commission concluded on the basis of sufficient and credible evidence that Tri-State salesmen were not free from Tri-State's control or direction over the performance of their services, we affirm the court of appeals.

As in *Princess House, Inc. v. DILHR,* 111 Wis. 2d 46, 330 N.W.2d 169 (1983) (of even date), the question is whether the alleged employer is liable for payments to the Unemployment Compensation Fund pursuant to the criteria set forth in sec. 108.02(3)(a) and (b),

[1] *Tri-State Home Improvement Co., Inc. v. Labor and Industry Review Comm.,* May 21, 1982.

Stats.[2] The record does not reveal any objection to the commission's finding that Tri-State's salesmen were individuals performing services under sec. 108.02(3)(a). Rather, the claim on the appeal from the commission's decision is that the exemptions under sec. 108.02(3)(b)1 and 2 are applicable, because the salesmen are not under the control, either by contract or in fact, of Tri-State and, additionally, because the salesmen have independently established businesses.

It is also claimed that the statute is unconstitutional because insurance and real estate agents are exempted from the operation of the law by sec. 108.02(5)(k)6 and 7.[3]

Because we conclude that Tri-State has no standing to challenge these exemptions, we do not address the merits

---

[2] "(3) EMPLOYE. (a) 'Employe' means any individual who is or has been performing services for an employing unit, in an employment, whether or not the individual is paid directly by such employing unit; except as provided in par. (b) or (c).

"(b) Paragraph (a) shall not apply to an individual performing services for an employing unit if the employing unit satisfies the department as to both the following conditions:

"1. That such individual has been and will continue to be free from the employing unit's control or direction over the performance of his services both under his contract and in fact; and

"2. That such services have been performed in an independently established trade, business or profession in which the individual is customarily engaged."

[3] "(k) 'Employment' as applied to work for a given employer other than a government unit or nonprofit organization, except as such employer duly elects otherwise with the department's approval, does not include service:

"6. By an individual for a person as an insurance agent or an insurance solicitor, if all such service performed by such individual for such person is performed for remuneration solely by way of commissions;

"7. By an individual for a person as a real estate agent or as as a real estate salesperson, if all such service performed by such individual for such person is performed for remuneration solely by way of commission."

of Tri-State's argument that the exemptions deny equal protection of the law and are violative of the uniform-taxation provision of the Wisconsin Constitution.

The facts show that Tri-State is a company which sells and installs steel and aluminum siding. Most of Tri-State's business is secured by the salesmen whose status is at issue in this case. The company, in respect to the salesmen, sets a price per hundred square feet for the siding and its installation. This price includes Tri-State's profit. The salesmen, on their own initiative, decide how much to charge an individual customer. When the installation is completed by Tri-State, the customer pays Tri-State directly. Tri-State then remits to the salesman the difference between Tri-State's price and the price for which the salesman has sold the siding and installation to the individual buyer. Thus, the salesman controls the profit margin on each job. Once a contract is accepted by Tri-State, the salesman's responsibility is at an end. When the sale is made on an installment basis, the contract is on a form provided the salesman by Tri-State or First Savings and Loan. Tri-State's name is inserted on the contract by the salesman at the time of the sale. It is undisputed that a contract negotiated by a salesman is between Tri-State and the homeowner. For cash sales a form is used which has printed on it the name Tri-State as the contractor.

Tri-State could, however, reject contracts which a salesman brought in. Among reasons for rejecting a contract would be Tri-State's suspicion that the salesman had made misrepresentations or Tri-State's conclusion that the contract price would result in a loss. Tri-State does not require the salesman to work certain hours, does not establish sales territories, and does not set sales quotas. No reports are required, no sales training is offered, and no meetings of salesmen are ever conducted. Salesmen pay their own expenses.

The salesmen are not required to handle Tri-State's business to the exclusion of the products or services of other companies. There was evidence that some of the salesmen in fact sold for other companies. Tri-State has some office space which the salesmen can use, and the salesmen are permitted on some occasions to draw against future unearned commissions. There is a group life insurance policy for the benefit of the salesmen, but apparently the premiums are paid *in toto* by the salesmen.

After customers are signed up, Tri-State sends "lead cards" to customers in order to get the names of anyone else who might be interested in purchasing siding. These lead cards are then turned over to Tri-State salesmen.

Whenever a salesman enters into a contract for siding which is to be installed by Tri-State, the salesman is required to have the customer sign a checklist. Unless this checklist is completed and signed by the customer, the job is rejected. The checklist provides:

> "TRI-STATE HOME IMPROVEMENT
> COMPANY, INC.
> (Established 1948)
>
> CHECKLIST (IN DUPLICATE)

Buyer states as follows:

1. Sales representative has not represented that our home will serve as a 'model home' or 'advertising job.'
2. Sales representative has not represented that we are receiving a special reduced price because of a close-out sale or because of any manufacturer's promotion or otherwise.
3. Sales representative has not stated that any sign will be placed on our premises in exchange for any price reduction or discount.
4. Sales representative did not represent himself as anything other than a sales representative of Tri-State Home Improvement Company, Inc.

5. No consolidation of personal loans have been offered as an inducement to enter into this agreement.

6. We have read the terms of the ———— warranty which we will receive upon completion of the job. We understand that this warranty is as to material and is from the manufacturer on a pro-rated basis after two (2) years, so that the percentage of cost to us increases over the lifetime of the warranty.

7. That no documents have been signed by the undersigned in blank.

8. That no gifts or bonuses have been promised to us as an inducement to entering into this agreement.

9. That we have not been requested to sign any completion slip prior to the completion of the job.

Receipt of one (1) copy of this checklist acknowledged. Dated this ———— day of ————, 19—.

_____
Buyer

_____
Buyer"

At the hearing, the manager of Tri-State stated that the purpose of the checklist was merely to make sure that the sales procedure had been accomplished consistent with state law and that the purpose of the checklist was to protect Tri-State from liability resulting from any misrepresentations that might be made by a salesman. Where there were complaints, it was expected that the complaints would be forwarded by the salesmen to Tri-State and Tri-State would make whatever adjustment was necessary with the customer.

As stated above, the court of appeals did not address the question of whether or not the salesmen were performing services in an employment under sec. 108.02(3) (a), Stats. We conclude that it was appropriate that they did not do so, for that issue had never been posed in any of these proceedings. The status of the salesmen under sec. 108.02(3)(a) was never raised in the administrative proceeding. Throughout the proceedings, it has

been Tri-State's position that, although the salesmen performed services for Tri-State, the exemptions under sec. 108.02(3)(b)1 and 2 applied. Although the issue under sec. 108.02(3)(a) was never specifically raised, there is substantial and credible evidence upon which the commission could have relied—that it was the duty of the salesmen to convince people to buy siding materials from Tri-State and to have those materials installed by Tri-State. This activity was clearly beneficial to Tri-State, and the record demonstrates that Tri-State was almost completely dependent on these salesmen.

As the facts demonstrate, Tri-State used postcards to get leads from customers for these salesmen, for the more jobs the salesmen would get for Tri-State, the more money Tri-State would make. There was a clear recognition by the principal officer of Tri-State that these salesmen performed services for Tri-State under sec. 108.02 (3)(a), Stats. As set forth in *Princess House, supra,* sec. 108.02(3)(a) is not a restatement of the common-law test for an independent contractor. The salesmen were performing services in an employing unit under the provisions of sec. 108.02(3)(a), Stats. *See* also, *Moorman Mfg. Co. v. Industrial Comm.,* 241 Wis. 200, 5 N.W. 2d 743 (1942), and *Price County Telephone Co. v. Lord,* 47 Wis. 2d 704, 177 N.W.2d 904 (1970).

Once the determination has been made that the individuals in question are performing services in an employing unit, the only question remaining is whether the statutory exemption applies. Both of the statutory conditions must be applicable to sustain an exemption from the tax; or, to put it conversely, if the fact situation fails to meet one of the statutory conditions, there can be no exemption.

The court of appeals upheld the order of the commission after finding that the commission's conclusions were

based on facts supported by credible and sufficient evidence.

The court of appeals largely relied on the checklist, which we have referred to above, and which we have incorporated into this opinion. We think it clear that, in view of this checklist and its admitted use, Tri-State could not establish that its salesmen have been, and will continue to be, free of Tri-State's control over the performance of their services. Although there is no written employment contract between the company and its salesmen, it is acknowledged that the use of the checklist is the *sine qua non* of a salesman's placing any orders with Tri-State. The use of the checklist is therefore a prerequisite to the payment of any commissions.

This checklist was used to prevent a salesman from engaging in certain practices during the sales procedure. It required the salesmen specifically to represent themselves as sales representatives of Tri-State. The salesmen could not engage in any of the practices prohibited by the checklist and continue to place orders with Tri-State. The provisions of the checklist were enforced. Hence, it is clear that Tri-State in fact controlled the performance of the salesmen in their efforts to sell Tri-State's materials and services.

Tri-State argues that the checklist is basically a reiteration of the provisions governing fair sales practices which appear in the Wisconsin Administrative Code sec. Ag 110.02 and that merely requiring compliance with the law was not the exercise of control over the salesmen. While the checklist is indeed a method of securing compliance with the law, a checklist of the type utilized by Tri-State is not mandated by the law, nor does it include all the fair trade practices of the code; and those that are included in the checklist are not verbatim excerpts from the statutes. It is apparent that the use of the checklist is a method devised by Tri-State to insure sufficient control over its employees so that Tri-State will

not run afoul of the law. By making the use of the checklist the absolute prerequisite for the payment of commissions, Tri-State has exercised control in fact over the sales conduct of these representatives.

At oral argument Tri-State's counsel stated that this checklist was substantially equivalent to the lease arrangement considered recently in *Star Line Trucking Corp. v. DILHR*, 109 Wis. 2d 266, 325 N.W.2d 872 (1982). We do not see the fact situations as being analogous. The issue in *Star Line* was whether an equipment lease mandated by the Wisconsin Administrative Code established the control necessary to defeat the direction or control exemption of the unemployment compensation statute. The lease language in *Star Line* was mandated by law. In the instant case, Tri-State, on its own volition and not because of legal compulsion, chose to use the checklist as a means of controlling the conduct of its salesmen. Moreover, we interpreted the lease provision in *Star Line* as not being for the purpose of establishing control over the employees, but rather it was intended solely to promote the financial responsibility of the licensed carrier. Our opinion emphasized that the control envisaged by the mandatory lease language was over the motor vehicle and not over the driver.

Thus, in at least three important particulars, the situation in *Star Line* differs from the checklist situation in the instant case. It is apparent from the face of the checklist itself that it is designed to control the conduct of the salesman. It has no other purpose; and, even though its ultimate effect is intended to be the protection of Tri-State, that protection is to be afforded by the enforcement of the control provisions of the checklist. The purpose of the checklist is to protect Tri-State's reputation for fair dealing or to protect it from possible liability; but the motivation for the checklist control is imma-

terial. The only question is whether the employees are or are not free from the company's control or direction over the performance of their services. They are not.

In addition to the checklist, there were other manifestations of employer control. For example, Tri-State could reject a contract if it thought there were misrepresentations made during the sales procedure, and the salesman relationship to the company could be terminated as a result of customer complaints. Whatever independence the salesmen had was hedged about with controls which could be invoked at the will of Tri-State.

Because there is sufficient evidence of control in the record to support the legal conclusion of the commission that the exemption under sec. 108.02(3)(b)1 is not applicable, we need go no further to affirm the court of appeals decision upholding the commission.

We note, however, that at oral argument counsel for Tri-State stated that the checklist was no longer being used. However, the record as developed by the commission is silent in respect to Tri-State's practices on the date of oral argument, and we cannot base our decision in this case on hypothetical facts that may or may not exist at the present time. We are confined to the record before us. Also, we point out that, although we have placed principal reliance on the controls manifested by the checklist, other indicia of control, as set forth above, also constitute credible and substantial evidence which would sustain the findings of fact by the commission.

Because Tri-State has failed in establishing a lack of control, it is unnecessary to consider whether or not the services of the salesmen have been "performed in an independently established trade, business or profession in which the individual is customarily engaged." We note in passing, however, that the evidence produced by Tri-State to support this ground for exemption is meager indeed.

As a final argument, Tri-State argues that sec. 108.02 (5) (k) 6 and 7, Stats., are unconstitutional because they deny equal protection and violate the uniform taxation provisions of the Wisconsin Constitution when those sections exclude from covered services the work of insurance agents or real estate agents who are remunerated solely by commissions. It is argued by Tri-State that its salesmen are also remunerated solely on a commission basis, and hence sec. 108.02 (5) (k) 6 and 7 are discriminatory.

The court of appeals concluded correctly that Tri-State lacked standing to raise this constitutional issue. The court of appeals reasoned that, whether or not these exemptions for other commissioned salesmen were struck down, Tri-State would nevertheless under the general unemployment compensation law be obliged to pay into the fund. It also pointed out that, because Tri-State does not compete with either real estate or insurance salesmen, its economic position is not affected by these exemptions. In short, it concluded that there is no significant relationship between these exemptions and the general statutory requirement that Tri-State must pay unemployment taxes. Accordingly, the court of appeals held that the situation here did not satisfy the "logical nexus" test of *Moedern v. McGinnis,* 70 Wis. 2d 1056, 236 N.W.2d 240 (1975).

This court has stated the standing requirement in various ways. We have said that a party has standing to raise a constitutional issue only if the statute alleged to be unconstitutional causes that party injury in fact and the party has a personal stake in the determination of constitutionality. *See, Mast v. Olsen,* 89 Wis. 2d 12, 278 N.W.2d 205 (1979). Although Tri-State alleges that it has a personal stake in the outcome of the action or proceeding to find the statute unconstitutional, it bases that argument upon the theory that the exemption of real estate and insurance agents from coverage increases its lia-

bility under ch. 108. There has been no proof of this, and the commission makes a convincing argument that no employer is affected in respect to its liability for payments into the fund by virtue of the exemptions of other employers.

*Moedern, supra,* upon which Tri-State places substantial reliance, involved the holders of a Class B liquor license who challenged statutory exemptions from licensing in certain situations. The court there said that, although there was a logical link between the status of the plaintiffs as liquor license holders and the subject matter of the statute, it could not conclude that there was a nexus between that status and the alleged constitutional deprivations the plaintiffs alleged, because the challenged classification did not relate directly to the plaintiffs' status. Thus, it is rather apparent that, whatever might be the propriety of the exemptions for real estate and insurance salesmen, their exempt classification does not relate directly to, or furnish a logical nexus in respect to, the situation in which Tri-State finds itself. The provisions which exempt real estate and insurance agents from unemployment coverage have nothing to do with the statutory provisions that require Tri-State to pay unemployment taxes. Were we to accept the argument that Tri-State has standing here, the outcome on the merits could be the abrogation of the statutory exemption with no benefit whatsoever redounding to Tri-State.

Nor could we, under the guidelines laid down by the legislature, invalidate the entire unemployment compensation law. Sec. 990.001(11), Stats., specifically provides that separate provisions of the statute are severable. Hence, no partial invalidity of the type urged by Tri-State could result in Tri-State's exoneration from the tax. The exemption provisions for real estate and insurance salesmen do not relate directly to the statutory re-

quirement that Tri-State pay unemployment taxes. The challenged portions of the statute do not cause an injury to Tri-State. There is no standing to object to the constitutionality of the exemptions.[4]

Accordingly, we conclude that the court of appeals properly affirmed the order of the commission; and we conclude, consistent with the affirmance of the commission's findings, that Tri-State salesmen were employees under the Unemployment Compensation Act and were not exempt. We do not reach the question of the constitutionality of the exemptions for real estate and insurance salesmen who are paid on a commission, because Tri-State's rights are unaffected by the constitutionality of those exemptions.

*By the Court.*—Decision affirmed.

[4] Reliance is also placed upon *Orr v. Orr*, 440 U.S. 268 (1979). In that case, however, the very statute that required husbands, including Mr. Orr, to pay alimony did not apply to wives. Thus, the burden upon Orr resulted from the challenged statute. In the instant case, Tri-State's burden to pay unemployment compensation taxes does not derive from the statutes it challenges on a constitutional basis, but from another statute. In *Orr v. Orr* there would be relief from the burden about which Mr. Orr complained, because the invalidation of the statute would invalidate the very statute which imposed the burden.