CITY OF MADISON and Russell E. Mueller,
Plaintiffs-Respondents,†

v.

TOWN OF FITCHBURG, Defendant-Appellant.

Supreme Court

*No. 82–1218.  Argued February 28, 1983.—Decided April 26, 1983.*

(Also reported in 332 N.W.2d 782.)

† Motion for reconsideration denied, without costs, June 1, 1983.
ABRAHAMSON, J., dissents.

For the defendant-appellant there were briefs by *Richard K. Nordeng, Carolyn P. Lazar* and *Stafford, Rosenbaum, Rieser & Hansen,* Madison, and oral argument by *Mr. Nordeng.*

For the plaintiffs-respondents there was a brief by *James M. Voss,* assistant city attorney, with whom on the brief was *Henry A. Gempler,* city attorney, and *Russell E. Mueller,* Madison, and oral argument by *Mr. Voss.*

Amicus Curiae brief was filed by *Burt P. Natkins,* legal counsel, Madison, for the League of Wisconsin Municipalities.

WILLIAM G. CALLOW, J. This is an appeal from a Dane county circuit court declaratory judgment and order granting a permanent injunction. The circuit court declared the Town of Fitchburg's incorporation Resolution No. 5–81 and the results of its April 7, 1981, referendum null and void and enjoined Fitchburg from certifying the referendum results to the Wisconsin Secretary of State. Fitchburg appealed and petitioned to bypass the court of appeals pursuant to sec. 808.05 and sec. (Rule) 809.60, Stats. We granted the petition to bypass.

On March 24, 1980, a petition requesting an incorporation referendum for Fitchburg under sec. 60.81, Stats., was filed with the Fitchburg Town Clerk. The petition was signed by 2,167 persons who owned real estate in Fitchburg. On March 31, 1980, the Fitchburg Town Board adopted Resolution No. 9–80 which scheduled a sec. 60.81 incorporation referendum for June 3, 1980. The resolution established notice procedures and set forth wards and boundaries for the proposed city.[1] The city of Madison (Madison) sued to enjoin the referendum. The circuit court granted the injunction. Ultimately, however, this court vacated the injunction, holding that the trial court lacked personal jurisdiction over Fitchburg. *In re Incorporation of Town of Fitchburg,* 98 Wis. 2d 635, 299 N.W.2d 199 (1980).

Subsequently, the Fitchburg Town Board passed Resolution No. 5–81 which rescheduled the sec. 60.81, Stats.,

---

[1] Fitchburg also initiated an incorporation proceeding in Dane county circuit court pursuant to Chapter 66, Stats.

referendum for April 7, 1981.[2] Madison and Russell Mueller then brought this action to invalidate the resolution and enjoin the referendum. On April 2, 1981, the circuit court denied the plaintiffs' motion for a temporary injunction. The court further ordered, however, that if the majority of votes cast were in favor of incorporation, the town clerk was enjoined from certifying the referendum results to the Wisconsin Secretary of State until it had been finally determined whether sec. 60.81 validly applied to Fitchburg. The referendum was held as scheduled on April 7, 1981. The Fitchburg residents voted by a margin of 1,637 to 304 to incorporate as a city.

Following the referendum, the merits of the case were put before the circuit court on motions for summary judgment brought by both sides. The circuit court held that Madison has standing to maintain this action but did not reach the question of Russell Mueller's standing. The court further held that Fitchburg could not use sec. 60.81, Stats., to incorporate because it is not " 'adjacent to a city of the first class.' " On May 21, 1982, the court entered a declaratory judgment and order which invalidated Resolution No. 5–81 and the referendum results and permanently enjoined Fitchburg from certifying the referendum results to the Wisconsin Secretary of State. Fitchburg appealed.

There are two issues presented on this appeal: (1) whether Madison and Russell Mueller have standing to maintain this action for declaratory judgment, and (2) whether the incorporation procedures set forth in sec. 60.81, Stats., are available to the residents of Fitchburg.

---

[2] Resolution No. 5–81 provided that the form of the ballot would be "for a city" or "against a city." In addition, the number and boundaries of wards for the proposed city of Fitchburg as set forth in Resolution No. 9–80 were incorporated by reference in Resolution No. 5–81.

## I.

In order to properly maintain a declaratory judgment action, " '[t]here must exist a justiciable controversy— that is to say:

" '(1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.

" '(2) The controversy must be between persons whose interests are adverse.

" '(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

" '(4) The issue involved in the controversy must be ripe for judicial determination.' " *Loy v. Bunderson,* 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982); *Klaus v. Vander Heyden,* 106 Wis. 2d 353, 364, 316 N.W.2d 664 (1982); *State ex rel. La Follette v. Dammann,* 220 Wis. 17, 22, 264 N.W. 627 (1936).

It is the third component of justiciability which is at issue in this case. The legal interest requirement has often been expressed in terms of standing. *Tooley v. O'Connell,* 77 Wis. 2d 422, 438, 253 N.W.2d 335 (1977). In order to have standing to sue, a party must have a personal stake in the outcome of the controversy. *Mast v. Olsen,* 89 Wis. 2d 12, 16, 278 N.W.2d 205 (1979); *Tri-State Home Improvement Co., Inc. v. Labor & Industry Review Commission,* 111 Wis. 2d 103, 113, 330 N.W.2d 186 (1983); *Moedern v. McGinnis,* 70 Wis. 2d 1056, 1064, 236 N.W.2d 240 (1975).

Fitchburg challenges Madison's standing on the ground that it does not have a legal interest in the sec. 60.81, Stats., incorporation proceeding. Unlike Chapter 66,[3]

---

[3] Neighboring municipalities may become parties to a Chapter 66, Stats., incorporation proceeding pursuant to sec. 66.014(5), which provides:

sec. 60.81 does not specifically grant standing to neighboring municipalities. According to Fitchburg, this court has previously decided that without such a standing provision a city cannot maintain an action to prevent the electors of an adjacent town from choosing to incorporate.

In *Schatzman v. Freenfield*, 273 Wis. 277, 77 N.W.2d 511 (1956), the plaintiff brought an action seeking to enjoin an incorporation referendum by the town of Greenfield. The city of Milwaukee petitioned for leave to intervene and be interpleaded, claiming that it had a substantial stake in the controversy. Milwaukee's alleged interests in the action were as follows: It had begun to annex certain town areas; it was already servicing those areas to some extent; Greenfield's incorporation would thwart its expansion; and it owned property in the town. This court held that these interests did not make Milwaukee a necessary party, and, therefore, the trial court did not err in denying the petition. We also suggested that Milwaukee may not have been a proper party to the action.

We considered essentially the same question in *Milwaukee v. Oak Creek*, 8 Wis. 2d 102, 98 N.W.2d 469 (1959). In that case Milwaukee challenged the incorporation of Oak Creek under sec. 60.81, Stats. Oak Creek demurred to the complaint alleging, among other things, that Milwaukee lacked standing to sue. The trial court sustained the demurrer. On appeal Milwaukee contended that it had standing by virtue of its ownership of property in Oak Creek and an annexation attempt. This court upheld the ruling of the trial court, finding that no

---

"PARTIES. Any governmental unit entitled to notice pursuant to sub. (4), any school district which lies at least partly in the territory or any other person found by the court to be a party in interest may become a party to the proceeding prior to the time set for the hearing."

rights or interests of Milwaukee were adversely affected by Oak Creek's incorporation.

Fitchburg argues that under *Greenfield* and *Oak Creek,* Madison is without standing to maintain this action. We disagree. Those cases do not compel such a result.[4] Since the *Greenfield* and *Oak Creek* decisions, the Wisconsin rules of standing have been liberalized. In *Wisconsin's Environmental Decade, Inc. v. PSC,* 69 Wis. 2d 1, 13, 230 N.W.2d 243 (1975), we held that "the law of standing in Wisconsin should not be construed narrowly or restrictively."[5] Indeed we have recently recognized that even a trifling interest may be sufficient to confer standing. *State ex rel. First National Bank v. M & I Peoples Bank,* 95 Wis. 2d 303, 309, 290 N.W.2d 321 (1980). Thus interests which were not sufficient to establish standing when *Greenfield* and *Oak Creek* were decided may enable a party to maintain an action under current notions of standing.

Madison has the same interests in this controversy as Milwaukee had in *Greenfield:* It owns property in Fitch-

---

[4] It has been suggested that policy concerns favor standing for a neighboring city in a suburban incorporation proceeding. One commentator stated: "[C]ertainly the central city should be authorized to litigate the legality of any suburban incorporation within a reasonable distance of its boundaries. *Contra: Schatzman v. Greenfield,* 273 Wis. 277, 77 N.W.2d 511 (1956). Otherwise, a rural area assumedly not entitled to incorporation may illegally incorporate so long as no local citizen is willing to contest it in court. Often the only objecting party is the neighboring city whose probable expansion through annexation will be blocked by the assumedly illegal incorporation." R. Cutler, *Characteristics of Land Required For Incorporation or Expansion of a Municipality,* 1958 Wis. L. Rev. 6, 26 n. 70.

[5] Although *Wisconsin's Environmental Decade, Inc. v. PSC,* 69 Wis. 2d 1, 230 N.W.2d 243 (1975), involved standing under the administrative review provisions of Chapter 227, Stats., the holding is equally applicable in the context of this case.

burg; it has instituted annexation proceedings for parts of Fitchburg; Fitchburg residents receive certain services from Madison and make use of Madison's facilities; and Fitchburg's incorporation will hinder Madison's growth by precluding future annexation of the Fitchburg area. Madison's stake in this case is not, however, limited to these interests. The incorporation of Fitchburg under sec. 60.81, Stats., would extinguish Madison's extraterritorial zoning and plat approval jurisdiction in the Fitchburg area. These powers, which are conferred by secs. 62.23(7a), 236.02(2), and 236.10, enable Madison to protect itself from hazardous or undesirable land uses within three miles of its corporate limits. Madison's extraterritorial jurisdiction is limited, however, to unincorporated lands by sec. 66.32.[6] Thus, if Fitchburg becomes a city, Madison will be precluded from regulating land use for its general welfare within this extraterritorial zone.

Madison also has an interest in protecting its city classification status. If Madison were elevated from a city of the second class to the first class, it would be required to make changes in its governmental structure and operations. Although Fitchburg does not attempt to force Madison to become a city of the first class, its effort to incorporate under sec. 60.81, Stats., implies that Madison has reached that status.

We conclude that, taken together, the aforementioned interests establish that Madison has a personal stake in

---

[6] Sec. 66.32, Stats., provides:

"**Extraterritorial powers.** The extraterritorial powers granted to cities and villages by statute, including ss. 30.745, 62.23(2) and (7a), 66.052, 146.10 and 236.10, shall not be exercised within the corporate limits of another city or village. Wherever such statutory extraterritorial powers shall overlap, the jurisdiction over said overlapping area shall be divided on a line all points of which are equidistant from the boundaries of each municipality concerned so that not more than one municipality shall exercise such power over any area."

the outcome of this controversy. Therefore, under the current law of standing Madison may properly maintain this action.

Fitchburg also contests Russell Mueller's standing. Mueller contends that he has a legal interest in this controversy because by incorporating under sec. 60.81, Stats., Fitchburg will deprive him the opportunity to participate in the pending incorporation proceedings under Chapter 66. Mueller further maintains that several procedural irregularities committed by Fitchburg in implementing the sec. 60.81 incorporation process injured him. Lastly, Mueller joins Madison in the assertion that sec. 60.81 violates Article IV, Sections 23 and 31 of the Wisconsin Constitution. Even assuming these allegations would establish a legal interest[7] in the controversy, we find that Mueller is without standing to maintain this action. Mueller's standing is dependent upon his being a resident of Fitchburg. Before this case was submitted to the trial court, Mueller moved out of Fitchburg. Therefore, his claim of standing was extinguished.

Having determined that one party has standing to maintain this action, we next turn to the merits.

## II.

Sec. 60.81, Stats.,[8] establishes a special incorporation procedure for towns which satisfy certain statutory re-

---

[7] We do not decide whether interests such as these alleged by Mueller would confer standing.

[8] Sec. 60.81, Stats., which is distinct from the general incorporation procedure under Chapter 66, provides:

"60.81 Towns may become cities. (1) PETITION. Whenever the resident population of any town exceeds 5,000 as shown by the last federal census or by a census herein provided for and is adjacent to a city of the first class and contains an equalized

quirements. The requirements of sec. 60.81 are as follows: The town must have a resident population exceeding 5,000; must be adjacent to a city of the first class;

valuation in excess of $20,000,000 and a petition has been presented and signed by 100 or more persons, each an elector and taxpayer of said town, and, in addition thereto, said petition contains the signatures of at least one-half of the owners of real estate in said town which petition requests submission of the question to the electors of the town and is filed with the clerk of the town, the procedure ior becoming a fourth class city is initiated.

(2) REFERENDUM. At the next regular meeting of the town board, said town board by resolution shall provide for a referendum by the electors of said town. The resolution shall observe the requirements of s. 5.15(1) and (2) and shall determine the numbers and boundaries of each ward of the proposed city, the time of voting, which shall not be earlier than 6 weeks after the adoption of said resolution and said resolution may direct that a census be taken of the resident population of such territory as it may be on some day not more than 10 weeks previous to the date of the election, exhibiting the name of every head of a family and the name of every person a resident in good faith of such territory on such day, and the lot or quarter section of land on which he resides, which shall be verified by the affidavit of the person taking the same affixed thereto.

(3) NOTICE OF REFERENDUM. Notice of the referendum shall be given by publication of the resolution in a newspaper published in such town, if there be one, otherwise in a newspaper designated in the resolution, once a week for 4 successive weeks, the first publication to be not more than 4 weeks before the referendum.

(4) VOTING PROCEDURE. The referendum shall be conducted in the same manner as elections for supervisors of the town board. The question appearing on the ballot shall be "Shall the town of . . . become a 4th class city?". Below the question shall appear 2 squares. To the left of one square shall appear the words "For a city" and to the left of the other square shall appear the words "Against a city". The inspectors shall make a return to the clerk of such town.

(5) CERTIFICATE OF INCORPORATION. If a majority of the votes are cast in favor of a city the clerk shall certify the fact to the secretary of state, together with the result of the census if any, and 4 copies of a description of the legal boundaries of the town

must have an equalized valuation exceeding $20,000,000; and a petition requesting an incorporation referendum must be signed by at least 100 persons who are both

and 4 copies of a plat thereof, whereupon the secretary of state shall issue a certificate of incorporation, and record the same in a book kept for that purpose. Two copies of the description and plat shall be forwarded by the secretary of state to the department of transportation and one copy to the department of revenue.

(6) CITY POWERS. Every city thus incorporated shall thenceforth be a body corporate and politic, with the powers and privileges of a municipal corporation at common law and conferred by ch. 62.

(7) EXISTING ORDINANCES. Ordinances in force in the territory or any part thereof, so far as not inconsistent with ch. 62, shall continue in force until altered or repealed.

(8) INTERIM OFFICERS. All officers of the town embracing the territory thus incorporated as a city shall continue in their powers and duties as theretofore until the first meeting of the common council at which a quorum is present. Until a city clerk shall have been chosen and qualified all oaths of office and other papers shall be filed with the clerk, with whom the petition was filed, who shall deliver them with the petition to the city clerk when he shall have qualified.

(9) FIRST CITY ELECTION. Within 10 days after incorporation of the city, the board with the clerk of which the petition was filed shall fix a time for the first city election, designate the polling place or places, and name 3 inspectors of election for each place. Ten days' previous notice of the election shall be given by the clerk by publication in the newspapers selected under sub. (3) and by posting notices in 3 public places in the city. Failure to give such notice does not invalidate the election. The election shall be conducted as is prescribed by chs. 5 to 12, except that no registration of voters shall be required. The inspectors shall make returns to the board which shall, within one week after the election, canvass the returns and declare the result. The clerk shall notify the officers-elect and issue certificates of election. If the first election is on the first Tuesday in April the officers so elected shall commence and hold their offices as for a regular term, as shall also their appointees. Otherwise they shall commence within 10 days and hold until the regular city election and the qualification of their successors, and the term of their appointees shall expire as soon as successors qualify."

electors and taxpayers of the town and by at least one-half of the town's real estate owners. With one exception, the parties agree that Fitchburg meets the requirements of sec. 60.81. The only matter in dispute is whether Fitchburg is "adjacent to a city of the first class." Thus this case turns on the interpretation of this statutory requirement.

In Wisconsin, cities are divided into four classes based on population. Sec. 62.05, Stats.[9] The first class consists of cities with a population of 150,000 or more. Sec. 62.05 provides that a city's classification shall change when (1) its population places it in a different class, (2) it provides for any necessary changes in government, and (3) when a proclamation of the mayor declaring the classification change is published according to law. Madison has had the requisite population (150,000) for first-class status since at least 1968. It has not, however, undertaken the two remaining procedures neces-

_____

[9] Sec. 62.05, Stats., provides:

"62.05 Classes of cities. (1) Cities shall be divided into four classes for administration and the exercise of corporate powers as follows:

(a) Cities of one hundred and fifty thousand population and over shall constitute cities of the first class.

(b) Cities of thirty-nine thousand and less than one hundred and fifty thousand population shall constitute cities of the second class.

(c) Cities of ten thousand and less than thirty-nine thousand population shall constitute cities of the third class.

(d) Cities of less than ten thousand population shall constitute cities of the fourth class.

(2) Population of cities shall be determined by the last federal census, including a special federal census taken of such city, except in newly incorporated cities when a census is taken as provided by law. Cities shall pass from one class to another when such census shows that the change in population so requires, when provisions for any necessary changes in government are duly made, and when a proclamation of the mayor, declaring the fact, is published according to law."

sary to effect a classification change.[10] Therefore, we have determined that Madison is not a city of the first class within sec. 62.05. *In re Incorporation of Town of Fitchburg,* 98 Wis. 2d at 644 n. 3.

Although Madison technically does not have first-class status, it does not follow ipso facto that Fitchburg has failed to satisfy the requirements of sec. 60.81, Stats. This court has consistently stated that the spirit or intention of a statute should govern over the literal or technical meaning of the language used. *Town of Menominee v. Skubitz,* 53 Wis. 2d 430, 437, 192 N.W.2d 887 (1972) ; *State ex rel. Jackson v. Leicht,* 231 Wis. 178, 183, 285 N.W. 335 (1939) ; *Board of Regents v. Mussallem,* 94 Wis. 2d 657, 668, 289 N.W.2d 801 (1980).

A 1923 opinion of the attorney general aptly discussed the distinction between the intended and technical meaning of a statutory reference to city classifications. 12 Op. Atty. Gen. 344 (1923). In 1923 the population of Stevens Point had exceeded 10,000, but the city had not taken the necessary steps to change from a fourth- to a third-class city. The Wisconsin Highway Commission asked whether Stevens Point was still a fourth-class city for purposes of the statute governing apportionment of bridge construction costs. The attorney general stated that under sec. 62.05, Stats., Stevens Point technically remained a city of the fourth class. However, the attorney general went on to say that, when a statute refers to a city's classification, it does not always mean the technical classification of sec. 62.05. Interpreting

[10] In 1920 the Wisconsin Attorney General was asked whether a change in a city's population automatically results in a classification change. The attorney general correctly responded in the negative, noting that under the terms of the statute a city's formal classification changes only when all the conditions are met. 9 Op. Atty. Gen. 476 (1920).

city classification in its technical sense for purposes of the bridge cost apportionment statute would allow a city, which by population qualifies for third-class status, to decline to make the classification change and thereby remain a city of the fourth class for bridge cost apportionment. The attorney general stated that this was not the intention of the legislature. Rather, he suggested that by referring to city classifications in the statute the legislature contemplated the population ranges of such classifications. This interpretation accords with the statute's intended purpose—to progressively apportion bridge costs based on the size of cities and their concomitant ability to pay. Thus he concluded that, with respect to the bridge cost apportionment statute, Stevens Point should be considered a city of the third class, notwithstanding its technical fourth-class status. The attorney general reaffirmed this reasoning in 19 Op. Atty. Gen. 437 (1930).

Although attorney general opinions are not controlling precedent, we believe that 12 Op. Atty. Gen. 344 (1923) is a correct analysis of the law. Accordingly, we conclude that the legislature's intended meaning of the phrase "city of the first class" within sec. 60.81, Stats., controls—for purposes of that statute—over its technical meaning under sec. 62.05.[1]

The conditions giving rise to a law along with the problems the law sought to cure are instructive in determining legislative intent. *Foth v. Macomber & Whyte Rope Co.*, 161 Wis. 549, 551–52, 154 N.W. 369 (1915).

[1] It must be noted that in most cases the intended meaning of a city classification does not differ from the formal, technical classification under sec. 62.05, Stats. The great majority of references to the class of a city are in statutes relating to the administration and exercise of a city's corporate powers. Such statutes ordinarily contemplate the formal city classification.

Therefore, in construing sec. 60.81, Stats., we turn to its historical context.

For more than a decade following World War II, urban areas throughout the United States experienced vast increases in population.[12] The Milwaukee metropolitan area grew rapidly during this period, resulting in a wave of annexations, incorporations, and consolidations. These changes often resulted in "jigsaw" boundary lines and caused numerous disputes between neighboring municipalities. Residents of towns adjacent to Milwaukee frequently resisted the city's annexation efforts. To preserve their local government and community identity, many towns sought to incorporate. The conflict between these suburban incorporation attempts and Milwaukee's annexation efforts resulted in a great deal of costly, protracted litigation and uncertainty. Meanwhile, as the population of these suburban areas increased, the local governments were faced with new problems. However, their rural-oriented town government system was not properly equipped to handle the effects of urbanization. A city government structure was needed.

In an effort to quickly solve the problems stemming from Milwaukee's rapid growth, local government officials from areas such as the town of Oak Creek worked to change the laws governing incorporation. As a result, sec. 60.81, Stats., which is sometimes called the Oak Creek law, was enacted in 1955.[13] Sec. 60.81 was designed to bring stability, certainty, and an end to the bickering and litigation between Milwaukee and the contiguous towns. In order to accomplish these objectives, the statute provided a special incorporation mechanism for such suburban communities.

---

[12] For a discussion of the historical events in the Milwaukee area during this period, *see:* R. Cutler, 1958 Wis. L. Rev. at 7–9.

[13] Laws of 1955, Chapter 500.

In short sec. 60.81, Stats., was the legislative solution to the unique problems facing populous towns adjacent to large cities. As the conditions giving rise to the statute suggest, it is the size of a city which creates the need for the special incorporation procedures of sec. 60.81, not whether the city is technically of the first class. Indeed, the mayoral proclamation and governmental changes necessary for a classification change under sec. 62.05, are irrelevant to the problems the legislature sought to cure through sec. 60.81. Moreover, unlike the population requirement, these two conditions are satisfied through city governmental action. Clearly the legislature did not intend to allow a city with a population of 150,000 or more to frustrate the purpose of sec. 60.81 by refusing to take the steps necessary to effect a formal classification change. Therefore, we conclude that the legislature intended the phrase "adjacent to a city of the first class" within sec. 60.81 to be a reference to cities with a population of 150,000 or more.

As noted earlier, Madison's population exceeds 150,000. Thus for purposes of sec. 60.81, Stats., Madison is a city of the first class even though it has not formally attained that status within sec. 62.05. We conclude that Fitchburg has satisfied the requirements for incorporation under sec. 60.81.

The plaintiffs, however, contend that sec. 60.81, Stats., is invalid under Article IV, Sections 23[14] and 31[15] of

[14] Article IV, Section 23 of the Wisconsin Constitution provides: "Town and county government. SECTION 23. [As amended Nov. 1962, April 1969 and April 1972] The legislature shall establish but one system of town government, which shall be as nearly uniform as practicable; but the legislature may provide for the election at large once in every 4 years of a chief executive officer in any county with such powers of an administrative character as they may from time to time prescribe in accordance with this

the Wisconsin Constitution. Without reaching the merits of this constitutional attack, we conclude that it must fail for lack of standing on the part of both plaintiffs. We have already determined that Russell Mueller is without standing to maintain the lawsuit. While Madison has standing to bring this action, it cannot raise this constitutional issue. It is well settled that a municipality, being a creature of the legislature, does not have legal capacity to challenge the constitutionality of a statute. *City of Madison v. Ayers*, 85 Wis. 2d 540, 544, 271 N.W.2d 101 (1978) ; *Town of Germantown v. Village of Germantown*, 70 Wis. 2d 704, 709, 235 N.W.2d 486 .(1975). Although there are exceptions to this rule, they are not applicable to suits between two creatures of the state. *Kenosha v. State*, 35 Wis. 2d 317, 331, 151 N.W.2d

---

section and shall establish one or more systems of county government."

[15] Article IV, Section 31 of the Wisconsin Constitution provides:

"**Special and private laws prohibited.** SECTION 31. [*As created Nov. 1871 and amended Nov. 1892*] The legislature is prohibited from enacting any special or private laws in the following cases:

"1st. For changing the name of persons or constituting one person the heir at law of another.

"2d. For laying out, opening or altering highways, except in cases of state roads extending into more than one county, and military roads to aid in the construction of which lands may be granted by congress.

"3d. For authorizing persons to keep ferries across streams at points wholly within this state.

"4th. For authorizing the sale or mortgage of real or personal property of minors or others under disability.

"5th. For locating or changing any county seat.

"6th. For assessment or collection of taxes or for extending the time for the collection thereof.

"7th. For granting corporate powers or privileges, except to cities.

"8th. For authorizing the apportionment of any part of the school fund.

"9th. For incorporating any city, town or village, or to amend the charter thereof."

36 (1967). Thus the plaintiffs' constitutional claim is without merit.

The plaintiffs' final claim, that the referendum results are invalid because of several alleged procedural irregularities, is also without merit.

We hold that Fitchburg is entitled to incorporate under sec. 60.81, Stats.

*By the Court.*—Declaratory judgment and order reversed.

HEFFERNAN, J. (*dissenting*). The majority has gullibly given credence to Fitchburg's underlying claimed right to incorporate—a claim that should have been dismissed out of hand as frivolous.

I completely agree with Justice Abrahamson's thoughtful and well crafted dissent, but she takes the majority too seriously. The frivolity of the majority opinion mirrors the frivolousness of the town's claim and deserves to be treated by the public and the legal community for the absurdity it is.

I differ from Justice Abrahamson only to the degree that she asserts that the majority's error stems from ignoring the literal language of the statute. I am compelled to conclude that the problem is not one of literalness, but of literacy. The majority's conclusion defies the expressed will of the legislature and a common sense understanding of the English language.

I dissent.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). A few years ago, a new crop of bumperstickers sprang up in Madison and its environs. These bumperstickers carried a message to the judiciary: FREE FITCHBURG. The majority apparently took the message to heart. In its zeal to free the Town of Fitchburg from the grasp of second-class city of Madison and to liberate Fitchburg in-

to city-dom, the majority also freed this court from having to apply a statute with which it disagrees and from adhering to its own prior opinion.

The majority reads the statutory phrase "adjacent to a city of the first class," appearing in sec. 60.81, as if the legislature had written "adjacent to a city with a population of 150,000 or more" (*supra*, p. 239), even though the legislature has provided that a city's first-class classification is not dependent solely on population. Sec. 62.-05(2) provides: ". . . Cities shall pass from one class to another when [the] census shows that the change in population so requires, *when provisions for any necessary changes in government are duly made, and when a proclamation of the mayor, declaring the fact, is published according to law*." (Emphasis added.)

In interpreting a statute the function of a court is to ascertain and effectuate the intention of the legislature. The legislative intention, as reflected in the clear words of sec. 62.05(2), is that Madison is not a first-class city for purposes of sec. 60.81. To overcome the clear words of secs. 60.81 and 62.05, the majority apparently adopts as a canon of statutory construction that "the spirit or intention of a statute should govern over the literal or technical meaning of the language used." *Supra*, p. 236. The majority attempts to derive this canon from the *Leicht, Skubitz,* and *Mussallem* cases, the last two of which rest on *Leicht.* These cases do not stand for the proposition that this court can be guided by the statute's "spirit" when it chooses to ignore the statute's words. These three cases set forth the canon of statutory construction this court invariably uses: when the literal language of the statute is ambiguous, thwarts the manifest purpose of the statute, or leads to an absurd, unreasonable, or unjust result, obscurity of meaning exists calling for judicial construction. *State ex rel. Jackson v. Leicht,* 231 Wis. 178, 183–85, 285 N.W. 335 (1939). *See*

*also* Llewelyn, *Remarks on the Theory of Appellate Decision and the Rules on Canons about How Statutes Are to Be Construed,* 3 Vand. L. Rev. 395, 403 (1950).

In this case, the court does not—and can not—say that the statutory language is ambiguous, thwarts the manifest purpose of the statute, or leads to an absurd result. Thus the plain meaning rule, a rule which has its critics,[1] including myself, but which this court invariably uses, *see The State Historical Society of Wis. v. Village of Maple Bluff,*[2] decided today, governs. If there ever was a situation for application of the rule, this is it. I am concerned that the court fails even to attempt to establish a coherent approach to the problem of statutory interpretation. This case and the *State Historical Society* case cannot help but confuse lawyers and legislators.

The majority opinion by ignoring the literal language of the statute renders the statutes ambiguous, thwarts the manifest legislative purpose, and reaches an absurd result. The result of the majority opinion is that Madison, which the majority recognizes as a city of the second class, becomes a first-class city for purposes of sec. 60.-81. Although the majority tries to limit the effect of its opinion (n. 11), its reasoning opens the courts' doors to those who wish to make Madison a city of first class for other statutory purposes, as well as to those who wish to change the classifications of other cities without com-

---

[1] Murphy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts,* 75 Colum. L. Rev. 1299, 1315 (1975).

[2] "On any question of statutory construction, the initial inquiry is to the plain meaning of the statute. If the statute is unambiguous, resort to judicial rules of interpretation and construction is not permitted, and the words of the statute must be given their obvious and intended meaning. *Wis. Bankers Ass'n v. Mut. Savings & Loan,* 96 Wis. 2d 438, 450, 291 N.W.2d 869 (1980)." 112 Wis. 2d 246, 252–253, 332 N.W.2d 792 (1983).

plying with the procedures set forth in sec. 62.05(2).[3] There are at least eleven fourth-class cities that meet the population standards of third-class cities[4] and at least two third-class cities that meet the population standards of second-class cities.[5] *1981–82 Blue Book,* State of Wisconsin. Indeed, even Fitchburg may be more liberated than it wants to be; it intends to incorporate as a fourth-class city, but it has the requisite population to be a third-class city. This court's opinion will cause a great deal of confusion, as the amicus curiae brief of the League of Wisconsin Municipalities points out.

If this court may, contrary to the plain meaning rule, look outside the statute to see if there is persuasive evidence of a clear legislative intention different from that to which an ordinary reading of the plain words of the statute would lead, and I think it may, I conclude that the legislative history in this case would not guide this court to the interpretation it adopted. *See* Johnson, *The Wisconsin Experience with State-Level Review of Municipal Incorporations, Consolidations, and Annexations,* 1965 Wis. L. Rev. 462; Cutler, *Characteristics of Land Required for Incorporation or Expansion of a Municipality,* 1958 Wis. L. Rev. 6; 1977 A.B. 694; 1979 A.B. 1180, Sen. Amend. 28.

---

[3] *See, e.g.,* sec. 6.78(1) (polls); 43.54(1) (library board); 62.08 (size of wards); 62.13(7), (7m) (compensation to and rest days for police officers); 62.13(11a) (fire department platoons); 62.23(7a)(a) (extraterritorial zoning); 86.32 (state aid for bridges); 145.05 (plumbers for waterworks); 213.13 (rest days for firefighters); 236.02 (extraterritorial plat approval); 985.06(1) (bid advertisements).

[4] Beaver Dam, pop. 14,149; Franklin, pop. 16,871; Menomonie, pop. 12,769; Mequon, pop. 16,193; Middleton, pop. 11,779; Monroe, pop. 10,027; Oak Creek, pop. 16,932; St. Francis, pop. 10,066; South Milwaukee, pop. 21,228; Sun Prairie, pop. 12,931; Whitewater, pop. 11,520.

[5] Eau Claire, pop. 51,509; Waukesha, pop. 50,319.

Finally, before I read this majority opinion, I, like the trial court in this case, thought that this court had decided the issue in this case in *In re Incorporation of Town of Fitchburg,* 98 Wis. 2d 635, 644, n. 3, 229 N.W.2d 199 (1980). In that case we stated that we concurred with the trial court which had determined that for purposes of interpreting sec. 60.81 "the City of Madison is not a city of the first class." *See* 98 Wis. 2d at 644 and n. 3. Although this court's statement in the first *Fitchburg* case did not decide the primary issue in the case, it "was plainly germane to that issue and . . . 'when a court of last resort intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision.' " *State v. Kruse,* 101 Wis. 2d 387, 392, 305 N.W.2d 85 (1981). We ought to abide by our decision in the first *Fitchburg* case.

For the foregoing reasons, I dissent.

I am authorized to state that CHIEF JUSTICE BRUCE BEILFUSS joins in this dissent.