# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2020AP1179

Complete Title of Case:

FRIENDS OF MAPLE GROVE, INC., A WISCONSIN CORPORATION, DR.
ANGELA SERVI, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE
GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, TRINA
LUTZKE, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE
GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, ANNETTE
NESKE, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE
GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, STEVIE
KLOCKZIEM, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE
GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION AND
KATHRYN HENRICHS, INDIVIDUALLY AS A MEMBER OF THE MAPLE
GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION,

     PLAINTIFFS-RESPONDENTS,

    V.

    MERRILL AREA COMMON PUBLIC SCHOOL DISTRICT,

    DEFENDANT-APPELLANT.

| | |
|---|---|
| Opinion Filed: | March 9, 2021 |
| Submitted on Briefs: | January 27, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:      On behalf of the defendant-appellant, the cause was submitted on the
                briefs of *Sarah A. Zylstra, Tess O'Brien-Heinzen* and *Tanner
                Jean-Louis* of *Boardman & Clark LLP*, Madison.

Respondent
ATTORNEYS:      On behalf of the plaintiffs-respondents, the cause was submitted on the
                brief of *David C. Moore* of *Nowlan & Mouat LLP*, Janesville.

**COURT OF APPEALS
DECISION
DATED AND FILED**

**March 9, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2020AP1179**

**STATE OF WISCONSIN**

Cir. Ct. No.  2020CV150

**IN COURT OF APPEALS**

---

**FRIENDS OF MAPLE GROVE, INC., A WISCONSIN CORPORATION, DR. ANGELA SERVI, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, TRINA LUTZKE, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, ANNETTE NESKE, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION, STEVIE KLOCKZIEM, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION AND KATHRYN HENRICHS, INDIVIDUALLY AS A MEMBER OF THE MAPLE GROVE GOVERNANCE BOARD, AN UNINCORPORATED ASSOCIATION,**

    **PLAINTIFFS-RESPONDENTS,**

  **V.**

**MERRILL AREA COMMON PUBLIC SCHOOL DISTRICT,**

    **DEFENDANT-APPELLANT.**

---

APPEAL from an order of the circuit court for Marathon County: MICHAEL K. MORAN, Judge. *Affirmed in part; reversed in part and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1      STARK, P.J.   This appeal involves a dispute regarding Maple Grove Charter School ("Maple Grove"), a public charter school in the Merrill Area Common Public School District ("the District").  In January 2020, the District sent a notice of default to the Maple Grove Governance Board ("the Governance Board"), asserting that the Governance Board had defaulted on various obligations set forth in its contract with the District.  Friends of Maple Grove, Inc., a Wisconsin nonstock corporation whose board of directors is comprised of the same individuals who are the members of the Governance Board, then sued the District, seeking a declaration that the events of default alleged in the District's notice were not sufficient to permit the District to terminate the contract.  Friends of Maple Grove also sought an injunction preventing the District from doing so.  The individual members of the Governance Board were later joined as plaintiffs, and the circuit court ultimately granted the plaintiffs' requested relief.

¶2      The District now appeals, arguing:  (1) the Governance Board lacked the authority to sue the District; and (2) the circuit court erred by determining that the Governance Board had not defaulted on its contractual obligations.  We reject the District's argument that the Governance Board could not sue the District.  We also conclude the court properly determined that the Governance Board did not default on its contractual obligations regarding academic performance and the use of an innovative educational program.  We therefore affirm the court's order in part.

¶3      We conclude, however, that the circuit court applied the wrong legal standard when determining whether the Governance Board defaulted under the contract provisions regarding enrollment. The contract provided that an event of default occurred if Maple Grove had "insufficient enrollment to successfully operate the Charter School *as determined by the District*." (Emphasis added.) This provision granted the District sole discretion to determine what level of enrollment was insufficient for Maple Grove to operate successfully. The only limitation on the District's exercise of discretion was that it was required to act reasonably and with a proper motive. *See **Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.***, 225 F.3d 876, 884 (7th Cir. 2000).

¶4      The circuit court therefore erred by substituting its discretion for that of the District when it determined that Maple Grove's enrollment was sufficient for successful operation. Accordingly, we reverse the court's order in part, to the extent the court concluded the Governance Board did not default with respect to enrollment. We remand for the court to reassess that issue using the proper legal standard—i.e., whether the District acted reasonably and with a proper motive when it determined that Maple Grove's enrollment was insufficient.

## BACKGROUND

¶5      In January 2017, the Governance Board entered into a charter school contract ("the contract") with the District pertaining to Maple Grove. The contract had a five-year term, which began on July 1, 2017, and ended on June 30, 2022.

¶6      Under the contract, the District authorized the Governance Board to operate Maple Grove as an instrumentality charter school within the District. As such, the District employs all personnel who work at Maple Grove, including the

principal and teachers. *See* WIS. STAT. § 118.40(7)(a) (2017-18).[1] Under the parties' contract, the District funds Maple Grove through its allocated state aid. The District also provides Maple Grove with transportation, food services, and administrative services, which include purchasing, accounts payable, accounting, bookkeeping, risk management, auditing, cash management, payroll, benefits administration, pupil services, recordkeeping, reporting, building and grounds maintenance, and student testing.

¶7      Several other provisions of the parties' contract are relevant to the issues raised in this appeal. First, § 4 of the contract provides that Maple Grove will "enroll students, with a targeted enrollment of a maximum of 100 students in grades Kindergarten through 5th grade." Section 4 also states that Maple Grove's "Educational Program" will meet students' needs "through standards-based integrated instruction and classes with multi-aged project based classes with exploratory learning and personal learning plans serving as the learning tools through which all subject standards are taught." Section 4 continues:

> The innovative and research based Project Based Learning model used by [Maple Grove] will be based on both clearly defined learning targets and broad, encompassing questions, or essential questions to guide learning. These essential questions, based upon major science, design, systems, literacy, and social studies themes related to the individual projects, will direct the focus of all core subjects using student passions and interests as an anchor for learning. The Project Based Learning focused, non-sectarian model, uses the school's surroundings and community as a framework and context for student learning. Wisconsin's common core curriculum standards in academics will be addressed in the integrated projects. Students will actively participate regularly in community experiences that will involve observing current events, collecting data, testing and evaluating hypothesis [sic], and drawing conclusions. The

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

content area instruction the students receive at [Maple Grove] will be fluid and connected to the essential questions of math, literacy, systems, design, community, science, and social studies.

Section 4 also provides that the "Educational Program" described therein "shall be the primary method used to attain the educational goals established by Wis. Stats. § 118.01."

¶8      Next, § 5 of the contract—entitled "Goals and Methods of Measuring and Reporting Student Progress"—states that "[t]he following goals and objectives shall be bench marks which [Maple Grove] shall aspire to obtain …."  One of the listed goals—entitled "Increase Students['] Ability to Direct Their Own Learning"—provides: "Objective: By the end of the first academic year (2017-2018) one hundred percent (100%) of students will have a Personalized Learning Plan."  Another of the listed goals—entitled "Increase Student Achievement"— states:

> i. Objective: the 2017-2018 school year will be the benchmark year.  In following years eighty percent (80%) of [Maple Grove] students will score at or above the national average in reading on the Measures of Academic Progress test, beginning Spring of 2019.  The same percentage will increase their proficiency on the same assessment when compared to their individual scores from the previous Fall, beginning in Spring 2018.

> ii. The 2017-2018 school year will be the benchmark year. In the following years eighty percent (80%) of [Maple Grove] students will score at or above the national average in mathematics on the MAP test, beginning spring of 2019.  The same percentage will increase their proficiency on the same assessment when compared to their individual scores from the previous fall, beginning in Spring 2019.

¶9     Finally, § 27 of the contract—entitled "Termination by District"—provides that the District may terminate the contract if it "finds that any of the following Events of Default have occurred":

> (1) The pupils enrolled in [Maple Grove] have failed to make sufficient progress toward attaining the educational goals under s. 118.01, Wisconsin Statutes, have failed to achieve standards under Wisconsin's Accountability Index, as determined by the State of Wisconsin for 3 consecutive years, or have failed to make progress as set forth in Section 5 of this Contract for 3 consecutive years;
>
> ….
>
> (6) The Governance Board defaults in any of the terms, conditions, promises or representations contained in or incorporated into this Contract;
>
> ….
>
> (8) At the close of the enrollment period, [Maple Grove] has insufficient enrollment to successfully operate the Charter School as determined by the District.

¶10    Section 27 then sets forth procedures that the District must follow in order to terminate the contract. As relevant here, if the District determines that a nonemergency event of default has occurred, it "shall advise [Maple Grove] in writing of the pertinent occurrence and shall specify a reasonable period of time (though in no instance less than 30 days) within which [Maple Grove] shall cure or otherwise remedy the specified Event(s) of Default to the reasonable satisfaction of the Superintendent." If the default is not timely cured, the District may terminate the contract "by written notice delivered within 10 days after expiration of the specified period."

¶11    On January 20, 2020, the District sent the Governance Board a "Notice of Events of Default." The notice alleged that three events of default had occurred under the parties' contract. First, the notice asserted that Maple Grove's

6

students had "failed to make [academic] progress pursuant to Section 5 of the Contract for 3 consecutive years." More specifically, the notice alleged that the "percentage of students at or above the national norm from fall 2017 to spring 2019 failed to increase consistently over those three years, and decreased in many instances."

¶12    Second, the notice of default alleged that the Governance Board "is not implementing the Educational Program of [Maple Grove] as promised and represented to the District in the Contract." The notice further alleged that Maple Grove's educational program "does not reflect the innovative program … most recently authorized in 2017 (Exploratory Learning)" and that the educational program "has not been clearly defined by the Governance Board and the innovative program described in the Contract has not been implemented." In addition, the notice asserted that the Governance Board had "unilaterally" acted to "try and 'rebrand' [Maple Grove] and adopt a Thematic and Project Based Learning program."

¶13    Third, the notice of default alleged that Maple Grove had "insufficient enrollment to successfully operate as determined by the District." The notice asserted:

> Section 4 of the Contract states that [Maple Grove] will have a targeted enrollment of 100 students in K-5. The School has had an average enrollment of 80 students over the last three years and a review of the enrollment figures since 2013 show[s] a steady decline in enrollment with 97 students in 2013 and 82 in 2019.
>
> Based upon these enrollment numbers as well as other factors, including [Maple Grove] and District revenue and expenses, costs to provide administrative services and transportation to [Maple Grove], anticipated capital costs of the [Maple Grove] school building, considerations of efficiency in District services and facility use, District-wide

staffing, and anticipated resources needed to address achievement gaps, the District Board of Education has determined that [Maple Grove] has insufficient enrollment to successfully operate.

¶14    The notice of default gave the Governance Board seventy-two days to cure the specified events of default "to the reasonable satisfaction of the Superintendent." The notice further stated the Governance Board's failure to cure the events of default within that time period "may be cause for the District Board of Education's termination of the Contract."

¶15    In response to the notice of default, on February 28, 2020, Friends of Maple Grove filed the instant lawsuit against the District. In its complaint, Friends of Maple Grove alleged that the Governance Board was "not in default under the terms of the Contract." The complaint further alleged that the District's "attempt to assert default on the part of Maple Grove under the terms of the Contract is pretextual and represents an attempt to terminate the Contract for reasons other than any purported act of default." The complaint therefore sought a declaration that the events of default alleged in the District's notice were not sufficient to allow the District to terminate the contract, and it also requested an injunction preventing the District from doing so.

¶16    The District subsequently asserted that Friends of Maple Grove was not a proper party because the contract was between the District and the Governance Board. Friends of Maple Grove disagreed; however, the parties ultimately stipulated to the joinder of the Governance Board's five members as plaintiffs in order to resolve the issue. We refer to the plaintiffs-respondents, collectively, as "the Governance Board" throughout the remainder of this opinion.

¶17    The circuit court held an evidentiary hearing on the Governance Board's claims over five days during May 2020, and the parties then submitted written closing arguments.  The court subsequently issued an oral ruling granting the Governance Board's requested declaratory and injunctive relief.

¶18    As relevant to this appeal, the circuit court first addressed and rejected the District's argument that the Governance Board had no authority to sue the District.  The court relied on WIS. STAT. § 118.40(4)(d)8., which grants a charter school governing board the power "[t]o sue and be sued in its own name."  The court also reasoned that parties to a contract have an "expectation … that the courts are there to enforce the terms of a contract if it cannot be resolved between the parties."

¶19    The circuit court next addressed whether the Governance Board had defaulted on its contract with the District.  First, the court concluded the evidence did not show that Maple Grove had failed to meet the academic goals set forth in § 5 of the contract for three consecutive years, as alleged in the District's notice of default.  The court noted that the contract went into effect on July 1, 2017, and the notice of default was issued on January 20, 2020.  The court therefore found that, regardless of whether the term "years" in § 5 referred to school years or calendar years, three consecutive years had not yet elapsed at the time the District issued its notice of default.

¶20    The circuit court also concluded that the academic objectives set forth in § 5 of the contract were merely goals that the Governance Board "must aspire to reach," rather than strict standards the Governance Board was required to attain. The court further found there was evidence that the Governance Board "tried to raise the test scores[,] and in some areas there was improvement again."  Thus, although the court reasoned that there "could be a default proven by consecutive scores over

a three year period, and a lack of attempt at progress, the lack of aspiration, essentially a charter school giving up," that was a "worst case scenario" and was "not the case here."

¶21 The circuit court next concluded that the Governance Board had not defaulted on its contractual obligations pertaining to enrollment. The court emphasized that although the contract provided for a maximum enrollment of 100 students, it did not specify a minimum enrollment. The court noted that during the contract term, Maple Grove had maintained an enrollment of approximately eighty students. The court also noted that during the same time period, declining enrollment was occurring "throughout the District." In addition, the court cited evidence that Maple Grove continued to be "financially viable" at its current level of enrollment.

¶22 The circuit court acknowledged that the contract granted the District discretion to determine what level of enrollment was insufficient for Maple Grove to operate successfully. While the court found it "difficult" to accept that the contract allowed the District to make that determination unilaterally, the court conceded that the District has "the final say on [the] enrollment question." The court stated, however, that "[t]here must be a basis for the District's determination." The court then concluded the evidence did not support a finding that Maple Grove's enrollment was insufficient for it to operate successfully, "given [that] the enrollment has remained steady in the past two and a half years of the contract."

¶23 The circuit court also concluded there was no default under the parties' contract with respect to Maple Grove's educational program. The court found that Maple Grove was "in the process of implementing the required curriculums during the … short two and a half years the contract was in place and

10

until the notice of default was issued." The court noted there was testimony that Maple Grove's students "were involved in projects such as collecting maple syrup, raising chickens, composting, science fairs and other activities." The court also found that Maple Grove had taken steps to "rebrand" its curriculum in the spring of 2019 to implement "thematic project-based learning," with the apparent approval of the District's superintendent. The court further found that in the fall of 2019, Maple Grove "was teaching core curriculum mandated by the District in the morning and introducing project-based learning in the afternoon." The court therefore stated it could not find that Maple Grove "failed to provide the programming" described in the parties' contract.

¶24 Finally, the circuit court concluded the Governance Board was entitled to an injunction because allowing the District to terminate the contract would result in irreparable harm—specifically, the closure of Maple Grove. The court also concluded there was no adequate alternative remedy. In addition, the court concluded that the equities favored granting an injunction, and that an injunction would not disserve the public interest.

¶25 The circuit court subsequently entered a final order declaring that "the purported events of default" set forth in the District's January 2020 notice of default were "not events of default sufficient to permit the [District] to terminate the contract between the parties." The order also permanently enjoined the District from "taking action to terminate said contract based upon the purported events of default" alleged in the January 2020 notice. The District now appeals.

## DISCUSSION

### I. Authority to sue the District

¶26    On appeal, the District renews its argument that the Governance Board lacked authority to sue the District. Our resolution of this issue requires us to interpret and apply both WIS. STAT. § 118.40 and the parties' contract. Statutory interpretation presents a question of law that we review independently. *McNeil v. Hansen*, 2007 WI 56, ¶7, 300 Wis. 2d 358, 731 N.W.2d 273. The interpretation of an unambiguous contract also presents a question of law for our independent review. *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶32, 330 Wis. 2d 340, 793 N.W.2d 476.

¶27    The circuit court concluded the Governance Board had authority to sue the District under WIS. STAT. § 118.40(4)(d)8., and we agree with that conclusion. Section 118.40 grants school boards the authority to enter into contracts for the operation of charter schools.[2]    *See* § 118.40(1m)-(2m), (3). Section 118.40(4)(ag) then specifies that each charter school "shall be governed by a governing board that is a party to the contract with the authorizing entity." Section 118.40(4)(d), in turn, sets forth the powers of a governing board, stating in relevant part: "Subject to the terms of its contract, a charter school governing board has all the powers necessary to carry out the terms of its contract, including all of the following: … To sue and be sued in its own name." *See* § 118.40(4)(d)8.

¶28    Thus, WIS. STAT. § 118.40(4)(d)8. expressly grants a charter school governing board the power to sue in its own name. Moreover, the statute grants the governing board the power to do so as necessary "to carry out the terms of its

---

[2] The statute grants "school boards" the authority to enter into charter school contracts. *See* WIS. STAT. § 118.40(1m)-(2m), (3). The charter school contract at issue in this case named the District as a party, rather than the District's school board. Nevertheless, the school board president signed the contract on the District's behalf. In any event, the parties do not assert that the distinction between the District and the school board makes any substantive difference for purposes of our analysis. We therefore do not address the issue further.

contract." *Id.* The statute does not contain any provision limiting the governing board's power to sue or otherwise providing that the governing board may not sue its authorizing school district. We therefore agree with the circuit court that under the plain language of § 118.40(4)(d)8., the Governance Board had authority to sue the District in order to enforce the terms of the parties' contract.

¶29 The District contends this interpretation of WIS. STAT. § 118.40(4)(d)8. is incorrect for two reasons. First, the District argues that because Maple Grove is an instrumentality charter school, it has a "superior-subordinate relationship" with the District and is a mere "extension" of the District. The District also emphasizes that Maple Grove is a "creature of statute," as the legislature authorized the creation of charter schools in § 118.40. The District then asserts that "[a]s a creature of statute, and instrumentality of the District, the Governance Board simply does not have the right to seek judicial enforcement" of its contract with the District. Stated differently, the District asserts that the general consent to sue granted by § 118.40(4)(d)8. does not permit the Governance Board to sue "its superior governmental entity."

¶30 There are at least two problems with the District's argument. First, the District conflates the Governance Board—the plaintiff in this lawsuit—with Maple Grove—the instrumentality charter school created by the Governance Board's contract with the District. Unlike Maple Grove, the Governance Board is not an instrumentality of the District, nor does it have a superior-subordinate relationship with the District. Rather, the Governance Board is a separate and independent party that entered into a contract with the District to create and operate Maple Grove. Thus, even if the District is correct that Maple Grove cannot sue the District, that proposition is not relevant here because the Governance Board, not Maple Grove, is the plaintiff in this lawsuit.

13

¶31      Second, even if the Governance Board could be construed as having a superior-subordinate relationship with the District, the District does not cite any legal authority supporting its contention that a subordinate government entity may never sue its superior government entity. The only legal authority the District cites is *City of Waukesha v. Salbashian*, 128 Wis. 2d 334, 382 N.W.2d 52 (1986). In that case, our supreme court took note of the "general rule" that "a municipality, as a creature of the legislature, lacks the legal capacity to challenge the actions of its creator." *Id.* at 349. In support of that general rule, the court cited *City of Madison v. Town of Fitchburg*, 112 Wis. 2d 224, 240, 332 N.W.2d 782 (1983), which stated: "It is well settled that a municipality, being a creature of the legislature, does not have legal capacity to challenge the constitutionality of a statute."

¶32      Thus, both *Salbashian* and *City of Madison* addressed whether municipalities, as creatures of the legislature, could challenge the legislature's actions. The District does not explain why it believes those cases should be read to mean that either a charter school or its governing board cannot sue an authorizing school district for alleged violations of a charter school contract. The District does not cite any other legal authority in support of its claim that the Governing Board, as a subordinate entity, may not sue the District, its superior entity. To the extent the District claims that either Maple Grove or the Governance Board is a "creature of the legislature," under *Salbashian* and *City of Madison*, that status would merely prevent them from suing the legislature, not the District.

¶33      The District also argues that our interpretation of WIS. STAT. § 118.40(4)(d) is flawed because the statute expressly states the powers listed therein are "[s]ubject to the terms of [a governing board's] contract." The District also notes that a charter school contract must specify "[t]he effect of the establishment of the charter school on the liability of the school district." *See*

14

§ 118.40(1m)(b)15., (2m)(a). Based on these provisions, the District argues we must consider whether the contract at issue in this case allows the Governance Board to file suit against the District.

¶34 The District then cites § 25 of the parties' contract, which states that "the establishment of [Maple Grove] shall have no effect on the liability of the District other than those obligations specifically undertaken by the District under this Contract." The District also cites §§ 27 and 28 of the contract, which set forth the procedures by which the District and the Governance Board, respectively, may terminate the contract in the event of a default by the other party. The District also notes there is no provision in the contract expressly stating that the Governance Board may sue the District to enforce the contract's terms. The District therefore argues that "the Governance Board's exclusive remedies are the default procedures identified in the Contract."

¶35 We disagree. Section 25 of the contract merely states that the District's liability is limited to the "obligations specifically undertaken by the District under this Contract." Here, the District issued a notice of default, which asserted that the Governance Board had defaulted on its contractual obligations in three ways. The Governance Board contends, however, that it has not defaulted. The Governance Board therefore sued the District to prevent it from terminating the parties' contract based on the alleged defaults. Stated differently, the Governance Board sued to prevent a prospective breach by the District—i.e., an unlawful termination of the contract. As such, the Governance Board sued to enforce an obligation specifically undertaken by the District under the contract—namely, its obligation not to terminate the contract absent the Governance Board's default. Section 25 does not prevent the Governance Board from suing the District on these grounds.

¶36     We also reject the District's argument that §§ 27 and 28 of the contract set forth the parties' exclusive remedies and therefore preclude the Governance Board from suing to enforce the contract's terms. As noted above, those sections describe the procedures the District and the Governance Board may use to terminate the contract in the event of a default by the other party. Nothing in the contract, however, states that those procedures are the parties' exclusive remedies. Moreover, there is nothing in the contract that prevents either party from seeking judicial enforcement of the contract's terms. "Parties who enter into contracts expect courts to enforce the terms, which the law requires unless the contract is for an illegal purpose or a party lacked capacity." *Mackenzie v. Miller Brewing Co.*, 2001 WI 23, ¶28, 241 Wis. 2d 700, 623 N.W.2d 739.

¶37     In summary, we conclude WIS. STAT. § 118.40(4)(d)8. grants a charter school governing board authority to sue its authorizing school district. We further conclude that nothing in the contract at issue in this case limited the Governance Board's ability to sue the District. We therefore reject the District's argument that the Governance Board lacked authority to file the instant lawsuit.[3]

## II. Default under the parties' contract

¶38     The District next argues that the circuit court erred by concluding the Governance Board did not default on its obligations under the parties' contract.[4]

---

[3] In addressing whether the Governance Board had authority to sue the District, both parties rely heavily on a Colorado case—*Academy of Charter Schools v. Adams County School District No. 12*, 32 P.3d 456 (Colo. 2001). We do not find that case helpful, as it applied a charter school statute that differs from WIS. STAT. § 118.40 in significant ways. We therefore confine our analysis to the plain language of § 118.40 and the parties' contract.

[4] Aside from arguing that the circuit court erroneously determined the Governance Board did not default, the District does not develop any argument that the court erred by granting the Governance Board either declaratory or injunctive relief. We therefore limit our discussion to the court's findings and conclusions regarding default.

Again, the interpretation of a contract presents a question of law that we review independently. *Town Bank*, 330 Wis. 2d 340, ¶32. However, the circuit court's findings of fact regarding the parties' conduct will not be set aside unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615.

¶39 On appeal, the parties dispute whether the District had the burden to prove that the Governance Board defaulted on its contractual obligations, or whether the Governance Board instead had the burden to prove that it did not default. The circuit court concluded the Governance Board had the burden of proof with respect to default, and we agree with that conclusion.

¶40 As a general rule, "the party seeking judicial process to advance a position carries the burden of proof." *Long v. Ardestani*, 2001 WI App 46, ¶37, 241 Wis. 2d 498, 624 N.W.2d 405. Here, the Governance Board sued the District, seeking declaratory and injunctive relief to prevent the District from terminating the parties' contract. The Governance Board's claims were premised on the assertion that, contrary to the District's contention, the Governance Board had not defaulted on its contractual obligations. On these facts, the Governance Board was the party "seeking judicial process to advance a position"—i.e., that the District could not lawfully terminate the parties' contract because the Governance Board had not, in

17

fact, defaulted. *See id.* The Governance Board therefore bore the burden to prove that it did not default on its contractual obligations.[5]

### A. Academic performance

¶41    The District argues the circuit court erred by concluding the Governance Board did not default on its contractual obligations related to academic performance.    As noted above, § 5 of the contract lists various "goals and objectives" that "shall be benchmarks which [Maple Grove] shall aspire to obtain." Under the heading "Student Goal 1—Increase Student Achievement," the contract contains an "[o]bjective" stating that the 2017-18 school year will be the benchmark year, and in following years, beginning in Spring 2019:  (1) 80% of Maple Grove's students will score at or above the national average in reading on the Measures of Academic Progress (MAP) test; (2) 80% of Maple Grove's students will score at or above the national average in math on the MAP test; (3) 80% of Maple Grove's students will increase their proficiency in reading on the MAP test when compared with their scores from the previous fall; and (4) 80% of Maple Grove's students will

---

[5]  The rule that the party seeking judicial process to advance a position bears the burden of proof is merely a "general rule" and, as such, is not necessarily applicable in all circumstances. *See Long v. Ardestani*, 2001 WI App 46, ¶37, 241 Wis. 2d 498, 624 N.W.2d 405.  The Governance Board, however, has failed to present a developed argument that this "general rule" is not applicable in the instant case.

Our supreme court has established a five-factor test for allocating the burden of proof.  *See Acuity Mut. Ins. Co. v. Olivas*, 2007 WI 12, ¶40, 298 Wis. 2d 640, 726 N.W.2d 258.  Despite citing *Olivas*, the Governance Board does not acknowledge the existence of this five-factor test or attempt to apply it to the facts of this case.  Under these circumstances, we decline to develop an argument on the Governance Board's behalf that the burden of proof should be allocated to the District under *Olivas*'s five-factor test.  *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 (we will not abandon our neutrality to develop arguments for a party).  Instead, we apply the general rule that the Governance Board, as the party seeking judicial process to advance a position, bore the burden to prove it did not default on its contractual obligations.

increase their proficiency in math on the MAP test when compared with their scores from the previous fall.

¶42    The District argues the undisputed facts show that 80% of Maple Grove's students have never met or exceeded the national average in either reading or math on the MAP test.  The District asserts it is also undisputed that there has never been a year in which 80% of Maple Grove's students increased their proficiency in reading or math from fall to spring.  The District contends these undisputed facts conclusively establish that the Governance Board defaulted with respect to academic progress under both § 27a.(1) of the contract—which states an event of default occurs if Maple Grove's pupils "have failed to make progress as set forth in Section 5 of this Contract for 3 consecutive years"—and § 27a.(6)—which states an event of default occurs if the Governance Board "defaults in any of the terms, conditions, promises or representations contained in or incorporated into this Contract."

¶43    The District's argument fails because, as the circuit court correctly noted, the contract expressly states that the various academic standards set forth in § 5 are merely "goals and objectives" that Maple Grove "shall aspire to obtain." Contrary to the District's assertion, under the plain language of the contract, the academic standards in § 5 were not strict thresholds that Maple Grove was required to reach in order to avoid default.  As such, the fact that 80% of Maple Grove's students never reached the various benchmarks set forth in § 5 of the contract does not establish that the Governance Board defaulted under either § 27a.(1) or § 27a.(6).

¶44    The District argues the academic standards in § 5 cannot be interpreted as merely aspirational because they are preceded by the word

"Objective." The District contends that "[w]hile a goal may be aspirational, objectives are not." However, the District cites no authority in support of this proposition. Nothing in the plain language of the contract indicates that the parties intended "objectives" to be mandatory but "goals" to be merely aspirational. To the contrary, § 5 expressly states that the "goals *and* objectives" listed therein "shall be bench marks which [Maple Grove] shall aspire to obtain." (Emphasis added.)

¶45 The District also asserts that if the academic standards in § 5 are merely aspirational, then there is no way for the parties to determine whether the Governance Board has violated § 5, such that an event of default has occurred under § 27a.(1). We agree with the circuit court, however, that the aspirational nature of the academic standards in § 5 does not mean the Governance Board can never be found in default for failing to comply with that section. Instead, as the court aptly explained, the Governance Board may be found in default on its obligations under § 5 if the evidence shows "a lack of attempt at progress, the lack of aspiration, essentially a charter school giving up." The court expressly found, however, that "[t]hat's not the case here," as the Governance Board proved "that [it had] tried to raise the scores[,] and in some areas there was improvement." The District has not shown that the court's finding in that regard was clearly erroneous.[6]

---

[6] The District asserts that when the default notice was served on the Governance Board, its president "had to ask for the MAP test scores for the last three years because she did not have them and *the Governance Board never kept track.*" However, the fact that the Governance Board's president did not have the test scores on hand when she received the District's notice of default does not establish that the Governance Board made no effort to improve the test scores during the contract term.

Moreover, the District's assertion that the Governance Board never kept track of the test scores is misleading. Although the District cites the Governance Board president's testimony in support of that assertion, the president actually testified that the test scores "were not something that the Governance Board kept track of *except by getting updates from [Maple Grove's principal] at board meetings.*" (Emphasis added.) Contrary to the District's assertion, this testimony indicates that the Governance Board was, in fact, kept apprised of Maple Grove's test scores.

¶46    Finally, citing evidence extrinsic to the contract, the District asserts that before it issued the default notice, the Governance Board had interpreted the academic standards in § 5 of the contract as "not simply aspirational, but firm requirements." The District contends it was "only after the Governance Board hired counsel that it claimed the 80% student achievement numbers were merely aspirational."

¶47    Be that as it may, we do not consider extrinsic evidence when interpreting an unambiguous contract. *See **Town Bank***, 330 Wis. 2d 340, ¶33. Here, § 5 of the contract unambiguously states that the academic standards set forth therein are goals or objectives that Maple Grove shall aspire to achieve. That language cannot reasonably be interpreted to mean that Maple Grove was required to meet the stated academic standards in order to avoid default. We therefore refuse to consider extrinsic evidence regarding how the Governance Board may have previously interpreted § 5. Instead, based on the unambiguous contract language, we conclude the academic standards were merely aspirational, and, as such, the failure to meet those standards did not constitute an event of default under the parties' contract.[7]

**B.  Educational program**

¶48    The District's notice of default also alleged that the Governance Board was in default under the parties' contract for failing to implement an

---

[7] As noted above, the circuit court also concluded the evidence did not show that Maple Grove had failed to meet the academic goals set forth in § 5 of the contract for three consecutive years, as alleged in the District's notice of default. Specifically, the court concluded that regardless of whether the term "years" in § 5 referred to school years or calendar years, the District had not presented three years of data. Because we conclude the academic standards in § 5 of the contract were merely aspirational, we need not address this alternative basis for the court's ruling.

innovative educational program. On appeal, however, the District begins its discussion of this issue by advancing a different argument. Namely, the District argues the circuit court should have concluded that the Governance Board defaulted by failing to implement personalized learning plans for 100% of Maple Grove's students, as required by § 5 of the contract. This argument fails for two reasons.

¶49 First, the plain language of the contract indicates that the implementation of personalized learning plans for all of Maple Grove's students was merely an aspirational goal, rather than a mandatory requirement. Again, § 5 of the contract sets forth "goals and objectives" that Maple Grove "shall aspire to obtain." Section 5b.i. then contains an "Objective" that states: "By the end of the first academic year (2017-2018) one hundred percent (100%) of students will have a Personalized Learning Plan." The failure to meet this aspirational goal did not constitute a default under the parties' contract.

¶50 Second, the District's notice of default did not assert that the Governance Board had defaulted on its contractual obligations by failing to implement personalized learning plans for 100% of Maple Grove's students. Instead, the notice asserted that the Governance Board was in default for failing to implement an innovative educational program. Because the notice did not allege any default regarding the implementation of personalized learning plans, there was no need for the circuit court to address that issue. As such, the court did not err by failing to do so.

¶51 We therefore turn to the alleged default that actually was raised in the District's notice—i.e., the Governance Board's failure to implement an innovative educational program. It is undisputed that § 4 of the parties' contract required Maple Grove to use an educational program that included a "Project Based Learning

22

model." The District interprets § 4 as requiring "all core curriculum [to] be embedded and taught through student projects." The District asserts that Maple Grove "never implemented" a project-based learning model "in the first nearly three years of the Contract." Although the District appears to concede that some project-based learning began in the fall of 2019, it asserts that the Governance Board remained in default because Maple Grove was not exclusively using project-based learning to teach its core curriculum.

¶52 This argument fails because the District does not point to any language in § 4 of the contract that unambiguously required *all* core curriculum to be taught through project-based learning. Instead, the contract merely required Maple Grove to use an educational program that included project-based learning as one of its "main features." The circuit court found that Maple Grove had, in fact, implemented a project-based learning program for a portion of its curriculum by the time the District issued its notice of default in January 2020. That finding is supported by evidence in the record and is not clearly erroneous.

¶53 Specifically, Maple Grove's teaching principal, Dr. Dawn Nonn, testified that as of March 2019, Maple Grove was using the District's curriculum for "English language arts and mathematics," but "for science and social studies we did more of the project-based learning." Nonn explained that Maple Grove "did core academics in the morning[,] and then we did the project-based [learning] in the afternoon."

¶54 Nonn further testified that in March 2019, she and the Governance Board were interested in "rebranding" Maple Grove's curriculum to "shore up what we wanted to call the type of learning taking place at the school." As part of the rebranding, they envisioned that beginning in the fall of 2019, some of the

English/Language Arts curriculum that was being taught in the morning would be moved into the afternoon and "blend[ed] … more into the project-based learning that was taking place in the afternoon." Nonn testified Maple Grove implemented that change in the fall of 2019 by "adjust[ing] the time that we had available for teachers to be able to put into the project-based learning so that it was a little bit more active and engaging for the children throughout the day."

¶55 Nonn's testimony supports the circuit court's finding that Maple Grove had implemented a project-based learning program before the District issued its notice of default in January 2020. Again, while the parties' contract required Maple Grove to have an educational program that included project-based learning, the District does not point to anything in the contract requiring the entirety of Maple Grove's curriculum to be taught using a project-based learning model. Consequently, the court properly determined that Maple Grove did not default by failing to implement the educational program required by the parties' contract.

### C. Enrollment

¶56 The District also argues that the Governance Board defaulted on its contractual obligations with respect to enrollment. Again, the contract states that Maple Grove "will enroll students, with a targeted enrollment of a maximum of 100 students." The contract further states that an event of default occurs if Maple Grove "has insufficient enrollment to successfully operate … as determined by the District."

¶57 We agree with the District that the contract, by its plain language, grants the District sole discretion to determine whether Maple Grove's enrollment is sufficient for successful operation. The circuit court expressed discomfort with this principle in its oral ruling, stating it was "difficult to find" that the contract

allowed the District to "unilaterally decide" whether Maple Grove's enrollment was sufficient. The court acknowledged, however, that "that's what the contract says." The court later reiterated that the contract gave the District "the final say on [the] enrollment question."

¶58 Nevertheless, the circuit court then proceeded to substitute its own discretion for that of the District regarding the sufficiency of Maple Grove's enrollment. The court cited the superintendent's testimony that Maple Grove was financially viable at its current level of enrollment. The court also noted that enrollment had been declining across the District during the contract term. The court then concluded that Maple Grove's enrollment was sufficient because it had "remained steady in the past two and a half years of the contract."

¶59 The circuit court apparently gave little or no weight to the District's evidence showing that Maple Grove's low enrollment directly impacted the District's finances. Brian Dasher, the District's director of finances, testified that the District received $9,700 in revenue from the State for each District resident enrolled at its schools. Dasher explained that Maple Grove's enrollment of approximately eighty students, rather than 100 students, meant a difference of approximately $200,000 in funding. Dasher also testified that because of Maple Grove's low test scores, the District was forced to spend funds that had originally been allocated for other schools on reading specialists and instructional coaches for Maple Grove students. Dasher testified that if Maple Grove had 100 students enrolled instead of eighty, the additional revenue from the State would have covered the cost of hiring those specialists.

¶60 In essence, the circuit court weighed the evidence and made an independent determination that Maple Grove's enrollment was sufficient for it to

operate successfully. The contract, however, granted *the District* sole discretion to determine whether Maple Grove's enrollment was sufficient. "When one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care*, 225 F.3d at 884. Thus, the proper inquiry was not whether the court reasonably believed that Maple Grove's enrollment was sufficient, but whether the District acted reasonably and with a proper motive when it determined that Maple Grove's enrollment was insufficient.

¶61 Consequently, the circuit court failed to apply the proper legal standard when considering whether an event of default had occurred under the parties' contract with respect to Maple Grove's enrollment. Moreover, the record is insufficient for us to apply the proper standard in the first instance on appeal—particularly regarding the issue of whether the District acted with a proper motive. We therefore reverse the court's decision, to the extent the court determined the Governance Board did not default on its contractual obligations with respect to enrollment. We remand for the court to consider whether the District's determination regarding the insufficiency of Maple Grove's enrollment was made reasonably and with a proper motive. *See id.*

¶62 No party shall receive appellate costs. *See* WIS. STAT. RULE 809.25(1).

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings.